STATE OF NEBRASKA, EX REL. NORFOLK BEET-SUGAR COMPANY, V. EUGENE MOORE, AUDITOR OF PUBLIC ACCOUNTS.

FILED DECEMBER 16, 1896.   No. 8818.

1. **Bounties: APPROPRIATIONS.** Session Laws, 1895, chapter 1, providing bounties for sugar manufactured in the state, carries no appropriation for the payment of such bounties; and, there being no appropriation for that purpose elsewhere, the auditor has at present no authority to issue warrants in payment of such bounties.

2. **Legislative Appropriations: CONSTITUTIONAL LAW.** Our constitution requires a specific appropriation made by law to authorize the expenditure of public funds. In the absence of such an appropriation the executive officers have no power to make such expenditures no matter how great may be the state's moral or legal obligation to pay.

3. ———: ———. An appropriation, within the meaning of our constitution, is the setting apart by law of a certain sum from the public revenue for a specified purpose, so that the executive officers are authorized to expend that sum, and no more, for that purpose, and no other.

4. ———: ———. An appropriation is not specific if it leaves the amount to be expended to be limited only by the extent of claims which may regularly be made upon it by the recipients, the amount of those claims being uncertain.

5. ———: ———: TIME. Appropriations can only extend to the end of the next fiscal quarter succeeding the adjournment of the next regular session of the legislature. Therefore an act by its express terms enduring for a longer period cannot be construed as carry-

ing an appropriation without making it void as in conflict with the constitution.

**6. Statutes:** CONSTRUCTION. When certain language is used in a statute, and language of similar import has previously been used in other acts, and has received a practical interpretation by the legislative and executive departments of the government, while such practical construction will not control the courts in construing the later act, it will generally be presumed that the language of the later act was adopted with a view to such practical construction given the earlier act.

ORIGINAL application for *mandamus* to compel the auditor of public accounts to issue a warrant in payment of relator's claim for bounty on beet-sugar, under chapter 1, Session Laws of 1895. *Writ denied.*

The facts are stated in the commissioner's opinion.

*Charles F. Manderson* and *W. S. Summers,* for relator:

Where a producer of sugar accepts the offer of a bounty from the state and complies with the statute, it would seem to be as much of a contract as it is possible for any citizen to make with the government. All the elements of a contract are present,—the terms, the consideration, and the lawful object. (*Calder v. Henderson,* 54 Fed. Rep., 802.)

A state cannot impair the obligation of contracts. (*State of New Jersey v. Wilson,* 7 Cranch [U. S.], 164; *Woodruff v. Trapnall,* 10 How [U. S.], 190; *Charles River Bridge v. Warren Bridge,* 11 Pet. [U. S.], 549.)

The statute makes an appropriation. The use of technical words in a statute is not necessary in order to make an appropriation. It is sufficient if the legislative intention appears. (*Campbell v. Board of Commissioners of State Soldiers' and Sailors' Monument,* 115 Ind., 591; *In re Appropriations,* 32 Pac. Rep. [Colo.], 272; *Proll v. Dunn,* 80 Cal., 220; *Carr v. State,* 22 Am. St. Rep. [Ind.], 624; *Reynolds v. Taylor,* 43 Ala., 420; *Nichols v. Comptroller,* 4 Stew. & P. [Ala.], 154; *Thomas v. Owens,* 4 Md., 189; *Green v. Purnell,* 12 Md., 329; *State v. Hickman,* 10 Mont., 497;

State v. Weston, 4 Neb., 216; People v. Brooks, 16 Cal., 11;
Goodykoontz v. Acker, 19 Colo., 360; Ristine v. State, 20
Ind., 329; State v. Hoffman, 35 O. St., 435; State v. Bur-
dick, 33 Pac. Rep. [Wyo.], 125; Reynolds v. Taylor, 43 Ala.,
420; People v. Miner, 46 Ill., 384; Humbert v. Dunn, 84
Cal., 57; State v. Moore, 40 Neb., 854; Hartman v. Green-
how, 102 U. S., 672; Poindexter v. Greenhow, 114 U. S., 270;
State v. Cardozo, 28 Am. Rep. [S. Car.], 275.)

A. S. Churchill, Attorney General, and George A. Day,
Deputy Attorney General, contra:

The act does not appropriate, within the meaning of
the constitution, any money for payment of a bounty.
(State v. Babcock, 22 Neb., 33; State v. Moore, 36 Neb., 579;
State v. Medberry, 7 O. St., 522; State v. Weston, 6 Neb., 17;
State v. Liedtke, 9 Neb., 468; State v. Wallichs, 12 Neb., 407;
State v. Kennon, 7 O. St., 546; State v. Babcock, 18 Neb.,
222; State v. Stover, 47 Kan., 119.)

IRVINE, C.

This is an original application for a writ of mandamus
to compel the respondent, the auditor of public accounts,
to draw a warrant in favor of the relator.   The right to
the warrant is claimed by virtue of "An act to provide
for the encouragement of the manfacture of sugar and
chicory, and to provide a compensation therefor." (Ses-
sion Laws, 1895, ch. 1.)   By the first section of this act
it is provided "that there shall be paid out of the state
treasury to any person, firm, or corporation engaged in
the manufacture of sugar in this state from beets, sor-
ghum, or other sugar-yielding canes or plants grown in
Nebraska, the sum of five-eighths of one cent per pound
upon each and every pound of sugar so manufactured
under the conditions and restrictions of this act."   This
is followed by a further provision whereby persons estab-
lishing after the passage of the act additional factories
shall receive an additional bounty of three-eighths of one
cent per pound.   Section 2 provides that no money shall

be paid upon sugar not containing at least ninety per cent crystallized sugar, nor upon sugar produced from beets for which as much as $5 per ton shall not have been paid by the producer, nor upon sugar produced from beets raised by a manufacturer of sugar.  Means of determining these facts are then provided by the act.  Following sections provide in the same manner for bounties upon chicory.  Section 8 is as follows: "When any claim arising under this act is filed, verified, and approved by the secretary of state as herein provided, he shall certify the same to the auditor of state, who shall draw a warrant upon the treasurer for the amount due thereon, payable to the party or parties to whom said sum or sums are due."  By section 9 of the act it is provided that it shall be in force a period of three years. The pleadings establish that the relator has manufactured sugar and presented proof thereof entitling it to a bounty of $805.  The auditor justifies his refusal to issue a warrant upon two grounds: First, that there is no lawful appropriation out of which such bounties may be paid; and second, that if there be such an appropriation, it is in excess of the power of the legislature to make such expenditures, appropriations for other purposes having exhausted the power.  No question is raised as to the general validity of statutes providing for bounties.  Of the two questions presented, we find it necessary to consider only the first.

It is conceded that the legislature has not, in any general appropriation act or in any way outside of the particular act already cited, made a provision for the payment of the bounty claimed.  It is, however, contended that in the provisions quoted from the act of 1895 there exists an appropriation wherewith to pay the bounty created.  It is solely to this question that we direct our attention.  It will be observed that the act, in brief, designates the amount of bounty to be paid for each pound of sugar manufactured, provides for the manner of ascertaining the amount of sugar manufactured, and directs the auditor, on production of proof of the

amount, to draw his warrant upon the treasurer therefor. It does not limit in any way the total sum of money to be so expended, and by its terms the act is to endure for a period of three years. By section 19 of article 3 of the constitution it is provided that "each legislature shall make appropriations for the expenses of the government until the expiration of the first fiscal quarter after the adjournment of the next regular session, and all appropriations shall end with such fiscal quarter." By section 3 of article 3 it is provided that the sessions of the legislature shall be biennial, except as otherwise provided in the constitution. By section 22 of article 3 it is provided that "no money shall be drawn from the treasury except in pursuance of a specific appropriation made by law and on the presentation of a warrant issued by the auditor thereon, and no money shall be diverted from any appropriation made for any purpose, or taken from any fund whatever, either by joint or separate resolution." Do the provisions of the act under consideration constitute a "specific appropriation" for the purpose designated within the meaning of these constitutional provisions, and did the legislature so intend? The relator contends that, having accepted the provisions of the act by manufacturing the sugar for which it claims the bounty, its relations with the state are contractual, and that the state cannot refuse payment, because to so do would be to impair the obligations of its own contract. There is, however, a broad distinction between the moral, and even in one sense the legal, obligation of a state to make a payment, and the duty or the power of its officers to fulfill that obligation. Under constitutions such as ours an appropriation for the purpose is indispensable to authorize the state's executive officers to make a payment, no matter how great the moral or the legal obligation may be on the part of the state to make such payment. The state being sovereign, while it may incur obligations, there is no method except those by itself established whereby such obligations may be enforced,

State v. Moore.

and it is in general for the legislature by means of an appropriation to recognize an obligation of the state and permit its enforcement. As said in *Ristine v. State*, 20 Ind., 328: "A promise by the government to pay money is not an appropriation. A duty on the part of the legislature to make an appropriation is not such. A promise to make an appropriation is not an appropriation. The pledge of the faith of the state is not an appropriation of money with which to redeem the pledge. Usage of paying money in the absence of an appropriation cannot make an appropriation for future payment." And, as said by the same court in *Carr v. State*, 127 Ind., 204, while clearly recognizing the obligations of a contract entered into by the state, "there is one essential and far-reaching difference between the contracts of citizens and those of sovereigns, not, indeed, as to the meaning and effect of the contract itself, but as to the capacity of the sovereign to defeat the enforcement of its contract. The one may defeat enforcement but the other cannot. This result flows from the established principle that a state cannot be sued. * * * Nor is this the only method under such a constitution as ours by which a state may defeat the enforcement of its obligation, for the failure to make the necessary appropriation will effectually accomplish that object. * * * The legislature has, therefore, the ability to avoid payment of the obligations of the state by a failure or refusal to make the necessary appropriation, although that body cannot impair the obligation of the contract. Creditors who accept the obligations of the state are bound to know that they cannot enforce their claims by an action against the state directly nor by an action against its officers where no appropriation has been made as the constitution requires." Such citations might be indefinitely multiplied, but the distinction between the obligation of a state to fulfill its contracts and the power of its ministerial officers to fulfill them in the absence of legislative authority is so marked and so well settled that we would not have gone

to this length in pointing it out were it not for the promi-
nence given in argument to the proposition that a con-
tractual relation exists and that therefore it should be
enforced in this proceeding.   It may be conceded for the
purposes of this case that the premises of the relator are
sound.   Still it does not follow that the writ should issue
in the absence of a valid appropriation.   The relator con-
tends that the language of the act itself created such an
appropriation, and cites authorities for the purpose of
establishing that to constitute an appropriation the word
"appropriation" or "appropriate" is not essential; that
it is sufficient that an intention to make an appropriation
is disclosed by the act.   This also may be conceded with
the qualification that it is the settled law of this state
that there can be no implied appropriation. (*State v.
Wallichs,* 15 Neb., 609.)   By that we understand that an
appropriation cannot be implied from the fact that the
legislature has by law created an obligation to make a
payment.   In addition to this it must appear that it has
provided for the payment by a constitutional appropria-
tion; in other words, the appropriation must be express,
although the expression may be in any language evidenc-
ing the intent and need not be in any set form of words.
Therefore, we cannot say, because the legislature did not
in this act use the word "appropriate" that it does not
carry an appropriation.   To solve the question we must
consider the meaning of the term "appropriation" as
used in the constitution, and ascertain whether, in the
law, the legislature has evidenced its intention to per-
form the act designated by that term.

The origin of legislative appropriations is so well
known that it seems almost a work of supererogation to
here allude to it.   Legislative appropriations are the out-
growth of the long struggle in England against royal
prerogative.   By degrees the power of the crown to levy
taxes was restrained and abolished, but it was found that,
so long as the crown might at its own discretion disburse
the revenue, the reservation to the people through parlia-

ment of the power to raise revenues was not a complete safeguard. Efforts to control the crown in disbursement as well as in the collection of revenues culminated with the revolution in 1688, and since then the crown may only disburse moneys in pursuance of appropriations made by act of parliament. Three evils were at that time felt. In the first place, the use of the realm's revenue for purposes unlawful or distasteful to the people; secondly, the inability to control the crown in the amounts expended for particular objects; and thirdly, the disposition of the crown to avoid encroachments upon its self-asserted prerogatives by dispensing for long periods with sessions of parliament. By requiring appropriations for limited periods it was sought to remedy all three evils—the first two by making appropriations specific in amount and object, and the third by making them for limited periods, so that frequent parliamentary sessions should be absolutely necessary. The first two objects have been the subjects of repeated comment. The third, in view of our constitutional provision for biennial legislative sessions, and limiting the duration of appropriations to the end of the quarter succeeding the following session, justifies us in quoting the following from 2 Hallam, Constitutional History, chapter 15, page 330: "The lords of the treasury, by a clause annually repeated in the appropriation act of every session, are forbidden, under severe penalties, to order by their warrant any moneys in the exchequer, so appropriated, from being issued for any other service, and the officers of the exchequer to obey any such warrant. This has given the house of commons so effectual a control over the executive power, or, more truly speaking, has rendered it so much a participator in that power, that no administration can possibly subsist without its concurrence; nor can the session of parliament be intermitted for an entire year, without leaving both the naval and military force of the kingdom unprovided for." (See, also, Creasy on the Constitution, page 293.) When our governments, state and federal,

came to be established, the requirement of legislative appropriations was adopted from England, along with many provisions having in view the preservation of the liberties of the people, and our own state constitution in the provisions quoted is somewhat more strict and more in accordance with the English practice than either the federal constitution or the constitution of most of the other states. Having in view the origin and history of appropriations as well as the general lexicographic meaning of the word, to "appropriate" is to set apart from the public revenue a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object and for no other. This definition cannot be too strict as applied to our own constitution containing the requirement that the appropriations must be specific. In *Ristine v. State*, 20 Ind., 328, "appropriation" is defined to be "an authority from the legislature given at the proper time and in legal form to the proper officers to apply sums of money out of that which may be in the treasury in a given year to specified objects or demands against the state." In *Clayton v. Berry*, 27 Ark., 129, it is said that "'appropriated by law' means the act of the legislature setting apart or assigning to a particular use a certain sum of money to be used in the payment of debts or dues from the state to its creditors." In *Humbert v. Dunn*, 84 Cal., 57, the court said: "Has the legislature fixed the amount of the claim and designated its payment out of a certain fund? These are the only things necessary to the validity of the appropriation." In *McCauley v. Brooks*, 16 Cal., 11, it is said, "to an appropriation within the meaning of the constitution nothing more is requisite than a designation of the amount and the fund out of which it shall be paid." It will be observed that each of these definitions includes as one of its requisites certainty as to the amount appropriated. In *Stratton v. Green*, 45 Cal., 149, the court said: "By a specific appropriation we understand an act by which a

named sum of money has been set apart in the treasury and devoted to the payment of a particular claim or demand." This definition was quoted with approval by the supreme court of Nevada in *State v. La Grave*, 41 Pac. Rep. [Nev.], 1075. We are not without a judicial definition of the term in our own state. In *State v. Wallichs*, 12 Neb., 407, the court said: "Specific appropriation means a particular, a definite, a limited, a precise appropriation." This definition was approved in *State v. Wallichs*, 16 Neb., 679.

We might well rest the case here, holding that the act in question was not an appropriation because not falling within the definitions of that term as given by our own court, and reinforced by the courts of other states and by a consideration of the history of the subject; but the earnestness and ability with which the case has been presented by the relator, as well as the importance of the interests which it is claimed are affected by this decision, justify us in stating the results of the further investigation which we have made, with the aid of counsel in the case. In *State v. Weston*, 4 Neb., 216, it was held that no appropriation by the legislature was necessary in order to authorize the payment of salaries fixed by the constitution for officers created thereby. The reason was found in section 25 of the schedule, directing the auditor to draw warrants for the payment of such salaries; and it was stated that this provision being contained in the constitution, it operated as a continuing appropriation for that purpose, and was not annulled by the requirement in the same instrument of biennial appropriations for other purposes. This case by no means conflicts with the conclusion we have indicated, because the constitution fixes the amount of the salary and the time of its payment. Shortly afterwards the court, in *State v. Weston*, 6 Neb., 16, held that the rule established in the former case applied only to officers whose offices were created by the constitution, and that for offices created by the legislature a specific appropria-

tion was required. *In re Groff*, 21 Neb., 647, involved incidentally a question as to the validity of an appropriation for the payment of the salaries of district judges. The appropriation bill included a single item for the salaries of district judges of $95,000. While it was intimated that under section 25 of the schedule of the constitution above referred to a judge might be entitled to the salary in the absence of a legislative appropriation, it was held that this appropriation was sufficient. But it will be observed that it was specific only in its gross amount and in its general object. It is hardly possible that the court would have considered an appropriation of "so much as may be necessary," without fixing any amount, as a valid appropriation were a legislative appropriation necessary. In *State v. Babcock*, 24 Neb., 787, the court considered an act to provide for the selling of unsold lots and lands belonging to the state, in the city of Lincoln, and appropriating the proceeds of such sale to the construction of the capitol. It was held that the lands having been sold under the provisions of that act, there was an appropriation of the amount realized for the purpose designated. It is true that at the time of the passage of this act the amount appropriated thereby was not in dollars ascertained. It was equivalent to the appropriation of the lands themselves, and was limited to the proceeds of those lands. The uncertainty in amount arose not in regard to demands of the claimant to the fund, but in regard to the amount of the fund itself. No discretion was vested in the executive officers as to the amount to be disbursed. There is here a broad distinction. By section 1, article 9, of the constitution the legislature is required to "provide such revenue as may be needful" by levying taxes, etc. It is essential that appropriations shall be limited in amount, in order that the legislature may know what revenue shall be needful, and provide therefor. But when the state has property in its possession there can be no objection to appropriating the proceeds of the sale of that property,

because the value of the property itself limits the appropriation, and no uncertainty arises in regard to the revenue. An appropriation may be specific, according to any of the definitions heretofore given, when its amount is to be ascertained in the future from the collection of the revenue. It cannot be specific when it is to be ascertained only by the requisitions which may be made by the recipients. The case of *State v. Moore*, 40 Neb., 854, much relied on by the relator, is in nowise in point. In that case there was a specific, limited, precise appropriation, in express terms, of a certain sum of money for a certain purpose, and the question was as to the authority of the legislature to appropriate money for that purpose; and further, as to whether the amount designated should control as against the amount justly required. The fact of the appropriation was not contested and was incontestible. The foregoing cases comprise those which it is claimed give color to the relator's contention. We think none of them, in fact, tends in any way to support it. On the other hand, we might cite many cases illustrating how strictly the court has insisted upon express appropriations, in conformity with the constitution, in order to justify an expenditure, among them *State v. Wallichs*, 12 Neb., 407; *State v. Wallichs*, 15 Neb., 457; *State v. Wallichs*, 15 Neb., 609; *State v. Wallichs*, 16 Neb., 679. One case quite closely in point is *State v. Babcock*, 18 Neb., 221. In that case a statute was under consideration whereby it was provided that if any county treasurer shall have paid into the state treasury any greater sum of money than is legally and justly due, the auditor shall issue his warrant for the amount so overpaid, which shall be paid out of the fund or funds so overpaid on said warrant. This act provided as specifically for what purpose the warrant should be drawn, and in whose favor, as the act we are considering. It contained as specific a direction to draw the warrant and it was at least as certain in the amount appropriated; more so, we think, because it must be less than the amount actually received

by the treasurer, while in this case, if we should hold the act to be an appropriation, it might appropriate in itself vastly more than the whole revenue of the state. But the court held that this was not an appropriation and did not justify the drawing of a warrant. The act cannot be treated as an appropriation, therefore, because it is not certain and limited in its amount. It is contended that the circumstances render a limit impossible. If so, it might be an argument against the validity of any appropriations for such a purpose. It cannot be an argument in favor of the validity of this one. But the very fact that the number of pounds of sugar which might be manufactured under the provisions of the act cannot be ascertained in advance renders it the more necessary for the legislature to fix a limit beyond which the expenditure for that purpose may not go. Otherwise it is impossible to provide a revenue with a view to the appropriations made.

It is contended, in answer to the objection that appropriations cannot extend beyond the end of the quarter following the adjournment of the next session of the legislature, that this may be treated as a valid appropriation for that period. But by section 9 of the act it is expressly provided that it shall endure for three years, which would be beyond the constitutional limit. Therefore, the legislature could not have intended the act to operate as an appropriation; or, if it so intended, it transgressed its powers, and, the period provided for being an important element, this invalid portion of the act must be held to have operated as an inducement to its passage, and therefore would, if construed as an appropriation act, invalidate the whole measure.

Some of the decisions of other states seem at first blush to conflict with some of the views herein expressed, but we think the conflict is more apparent than real. Thus, in many states there is no provision by constitution limiting the duration of appropriations. Accordingly it is, in such states, held that general acts of the legislature

creating an obligation of the state and fixing the amount to be paid may operate as a continuing appropriation. As, for instance, in Colorado, *In re Continuing Appropriations*, 18 Colo., 192; in Alabama, *Nichols v. Comptroller*, 4 Stew. & P. [Ala.], 154, and *Reynolds v. Taylor*, 43 Ala., 420; in Wyoming, *State v. Burdick*, 33 Pac. Rep. [Wyo.], 125. In this class fall all those cases which hold that a statute creating an office and fixing the salary constitutes a continuing appropriation for its payment. Again, it is held in some states that an appropriation may be implied. In these states the constitution does not require all appropriations to be "specific," and that doctrine is contrary to the decisions of this court. So, too, in states having similar or somewhat similar provisions to our own, implied, indefinite, and continuing appropriations have been enforced on the ground that they were made by the territorial legislatures, and that the state constitutions were not retroactive in their effect. Such seems to be the doctrine in Montana and South Dakota. In Illinois an act of the legislature appropriated the proceeds of a certain tax to a particular purpose. It was held that this was sufficient, although the amount to be derived from such tax was then unknown. (*People v. Miner*, 46 Ill., 384. See, also, *State v. Hipple*, 64 N. W. Rep. [S. Dak.], 120.) The remarks made with reference to *State v. Babcock*, 24 Neb., 787, are applicable to this class of cases. But Kansas, under constitutional provisions like our own, holds otherwise. (*Martin v. Francis*, 13 Kan., 220.) In no case, however, which we have been able to discover, under any constitutional provision has it been held that an appropriation is valid when it is uncertain in its amount, and that uncertainty arises with regard to the extent of the demands or claims which the recipients of the fund may present against it. On the other hand, in nearly all the cases cited, and in many more which might be cited, among them a long line of California cases, wavering in other respects, but always steadfast in this, certainty in amount is treated as an

essential requisite of a valid appropriation. We are not without the aid of a construction placed on acts similar to this by the other departments of the government. We are aware that such construction is not conclusive, but when the legislature, in framing an act, resorts to language similar in its import to the language of other acts, which have received a practical construction by the executive departments and by the legislature itself, it is fair to presume that the language was used in the later act with a view to the construction so given the earlier. In 1877 there was passed (Session Laws, 1877, p. 213) an act "to provide for the payment of bounties for the destruction of wild animals in the state of Nebraska." This act provided, in brief, that any person killing wolves, wild cats, or coyotes within the state, and presenting the scalps thereof to the clerk of the county in which the same were killed, with other proof, should be entitled to a bounty of $1 for each of such animals so killed. It was provided that the county clerk should issue a certificate to the person entitled, and that upon the same being filed with the auditor, "said auditor shall draw his warrant on the treasury of the state, against the general fund, for the amount of such certificate, in favor of the person named therein or his assignee." It has never been assumed that this act operated as a continuing or even a temporary appropriation of money wherewith to pay such bounties. Appropriations to fulfill the purpose of the act have since its passage been made in certain years, and in one year at least, to-wit, 1889 (Session Laws, 1889, p. 611), the appropriation was made to cover not only future bounties, but outstanding claims, the previous legislature having failed to make any appropriation. It is a matter of general knowledge that payments of such bounties have been made when express appropriations existed, and not at other times. In 1875 (Session Laws, p. 156) an act was passed providing a bounty for the discoverer of a vein of coal, and providing, also, that warrants should be issued in payment thereof.

State v. Moore.

Once, at least, an item for the payment of such bounties has been included in the general appropriation bill.

We conclude that the provisions of the act in question do not make an appropriation. At most, they create an obligation and provide for the manner of its satisfaction when appropriation shall be made. It was not the intention of the legislature to make an appropriation by the act, and if it had been its intention so to do, such appropriation would be void for uncertainty in amount, and because it transgressed the constitutional limit of time.

WRIT DENIED.