Argued February 19, reversed and dismissed April 13, 1920.

## HOLMES *v.* OLCOTT, SECRETARY OF STATE.

(189 Pac. 202.)

**Game—Commission Vested With Discretionary Power to Expend License Fees.**

1. It was the evident intent of the legislature by Laws of 1915, Chapter 287, Section 11, paragraph "h," to invest the fish and game commission with a discretionary power to protect and propagate game within the state and to expend, subject to legislative approval, the money derived from fees and licenses.

**States—Money cannot be Expended Without Appropriation Therefor.**

2. The authority to make an appropriation of state moneys is vested exclusively in the legislature, and no commission or individual has any power whatever to expend the public moneys without a legislative appropriation therefor, in view of Article IX, Section 4, of the Constitution.

**States—Appropriation of Public Moneys Held Sufficiently Definite and Certain.**

3. The moneys and license fees appropriated by Laws of 1915, Chapter 287, and Laws of 1915, Chapter 257, Section 3, as amended by Laws of 1917, Chapter 243, Section 1, for the protection and propagation of game within the state, although no sum is specified, become definite and certain when the moneys are collected and turned in to the state treasurer, all of such sums paid in to be used for the purpose specified, and the appropriation of such moneys is sufficiently definite as to amount.

> [As to the appropriation of public money within constitutional provision relating thereto, see note in **Ann. Cas. 1915A,** 1240.]

Constitutional Law—Vesting Fish and Game Commission With
  Authority to Expend Moneys Discretionary With Legislature.

4. Vesting the fish and game commission with authority to expend all moneys and license fees collected, as was done by Laws of 1915, Chapter 257, Section 3, as amended by Laws of 1917, Chapter 243, Section 1, was a matter within the discretion of the legislature, upon which the court has no right to express its views.

States—Statute a Continuing "Appropriation" of Moneys and
  License Fees for Protection of Game.

5. Laws of 1915, Chapter 257, Section 3, as amended by Laws of 1917, Chapter 243, Section 1, providing that moneys and license fees paid into the state treasury shall be considered as an appropriation, etc., is in the nature of a continuing "appropriation" of the amounts paid in, under Laws of 1915, Chapter 287, and is an "appropriation" made by law within the meaning of Article IX, Section 4 of the Constitution.

Game—Commission Empowered to Purchase Farm for Propagation
  of Chinese Pheasants.

6. The purchase of a farm for the propagation of Chinese pheasants is germane to and within the purview of Laws of 1915, Chapter 287, authorizing the fish and game commission to expend money for the protection and propagation of game, etc.

From Marion: GEORGE G. BINGHAM, Judge.

In Banc.

The plaintiff alleges that he—

"Is a resident and inhabitant of Multnomah County, State of Oregon, and a taxpayer in said state and county, and brings this suit in his own interest and in the interest of all other taxpayers in the State of Oregon to prevent the illegal disbursement of public funds, which he alleges to be true upon information and belief."

That the defendant Ben Olcott is Secretary of State, and with the other defendants constitutes the state board of fish and game commissioners, of which he is *ex-officio* chairman; that the commission was created by virtue of Chapter 287, Laws of 1915; and that about July 3, 1919, the members thereof "authorized the purchase of a game farm in Lane County for the propagation of Chinese pheasants," known as the Reddish

farm, at an agreed price of $7,680, payable in installments from and out of the public funds in the hands of the defendant Hoff as state treasurer. The complaint states that on the date last mentioned the commission "approved the payment of a claim in the sum of $2,000 as the first installment of the purchase price of said game farm"; that, as Secretary of State, the defendant Olcott threatens to and will audit said claim when it is presented and will draw his official warrant for the amount thereof on the defendant Hoff; that, unless restrained and enjoined, the defendant Hoff threatens to and will pay said warrant; and that the other members of the commission will approve further claims for the payment of the balance of the purchase price. It is next alleged that "under and by virtue of Chapter 287, Laws of 1915, all moneys collected for license fees for hunting and fishing are required to be deposited to the general funds of the State of Oregon," and for the reason that the legislature has not enacted any law authorizing the purchase of the farm or made any appropriation therefor, "the auditing of the said claim and the drawing of a warrant therefor by the defendant Secretary of State and the payment thereof by defendant state treasurer will be a withdrawal of said money from the state treasury in direct violation of Section 4 of Article IX of the Constitution of the State of Oregon"; that by the payment of such warrant "the funds of the State of Oregon will be dissipated and lost and plaintiff's burden of taxation will thereby be appreciably increased to his irreparable damage." The plaintiff prays for a decree enjoining the auditing and payment of the $2,000 and the allowance of any further claims for the payment of the balance of the purchase price "and the cost of operation and maintenance of said game farm."

To this complaint the defendants filed a demurrer on the following grounds:

"That the plaintiff has not legal capacity to sue.

"That there is a defect of parties defendant for the reason that Frank E. Reddish, the vendor of the lands payment for which is sought to be enjoined by the plaintiff, is a necessary party to said suit.

"That said complaint fails to state facts sufficient to constitute a cause of suit against said defendants or any of them."

This was overruled on September 3, 1919. The defendants elected to stand on their demurrer and on November 3d following, the court rendered a decree as prayed for in the complaint, enjoining the issuance and payment of said warrant. The defendants appeal, claiming that the court erred in not sustaining their demurrer and "in not giving and entering judgment and decree in favor of the defendants."

                              REVERSED AND REMANDED.

For appellants there was a brief over the names of *Mr. George M. Brown,* Attorney General, and *Mr. Isaac H. Van Winkle,* Assistant Attorney General, with an oral argument by *Mr. Brown.*

For respondent there was a brief over the names of *Mr. William P. Lord* and *Mr. Arthur I. Moulton,* with an oral argument by *Mr. Lord.*

JOHNS, J.—Section 4 of Article IX of the Constitution provides:

"No money shall be drawn from the treasury but in pursuance of appropriations made by law."

Section 7 of the same article is as follows:

"Laws making appropriations for the salaries of public officers and other current expenses of the state shall contain provisions upon no other subject."

The decision of this case depends upon the construction of those sections.

Section 4 is historical and is identical with that of the federal Constitution and the organic law of numerous states. Such provisions are substantial copies of declaratory acts or resolutions of the British Parliament which were adopted when British subjects were claiming and asserting their rights. In the early government of England the king levied, collected and expended the public revenues. Through a series of reforms, after the revolution of 1688 it finally became a law that the king could not use the public money unless it was specially appropriated by an act of Parliament. The abuse to be corrected by the establishment of the principle was in the exercise of official discretion with regard to the expenditure of public money. The purpose to be accomplished was to impose upon the legislative power this duty and to give to it alone the right of specifying the particular demands against the state which should be paid from time to time out of public funds.

It will be noted that Section 4 of Article IX does not specify how an appropriation shall be made, or when it shall be made. Hence, those questions become important.

In the leading case of *Ristine* v. *State of Indiana,* 20 Ind. 328, the Supreme Court of that state said:

"Appropriation, as applicable to the general fund in the treasury, may, perhaps, be defined to be an authority from the legislature given at the proper time, and in legal form, to the proper officers to apply sums of money out of that which may be in the treasury, in a given year, to specified objects or demands against the state."

In 1 Words & Phrases, page 471, we find:

" 'Appropriation' is the setting apart from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and for no other.

"To appropriate means to allot, assign, set apart, or apply to a particular use or purpose. An 'appropriation,' in the sense of the constitution, means the setting apart a portion of the public funds for a public purpose, and there must be money placed in the fund applicable to the designated purpose to constitute an appropriation.

"An 'appropriation' of money to a specific object is an authority to the proper officers to pay the money because the auditor is authorized to draw his warrant upon an appropriation, and the treasurer is authorized to pay such warrant if he has appropriated money in the treasury."

In *State ex rel. Norfolk Beet-Sugar Co.* v. *Moore*, 50 Neb. 88 (69 N. W. 373, 61 Am. St. Rep. 538), it is held:

"An appropriation, within the meaning of our Constitution, is the setting apart by law of a certain sum from the public revenue for a specified purpose, so that the executive officers are authorized to expend that sum, and no more, for that purpose, and no other.

"An appropriation is not specific if it leaves the amount to be expended to be limited only by the extent of claims which may regularly be made upon it by the recipients; the amount of those claims being uncertain."

The opinion also quotes with approval the definition of "appropriation" in *Ristine* v. *State of Indiana*, 20 Ind. 328. In *Clayton* v. *Berry*, 27 Ark. 129, it is said that "appropriated by law" means the act of the legislature setting apart or assigning to a particular use a certain sum of money to be used in the payment of debts or dues from the state to its creditors. In

*Humbert* v. *Dunn,* 84 Cal. 57 (24 Pac. 111), the court said:

"Has the legislature fixed the amount of the claim, and designated its payment out of a certain fund? These are the only things necessary to the validity of the appropriation."

In *People* v. *Brooks,* 16 Cal. 11, it is held:

"To an appropriation, within the meaning of the Constitution, nothing more is requisite than a designation of the amount and the fund out of which it shall be paid."

*Stratton* v. *Green,* 45 Cal. 149, holds that by a "specific appropriation" is understood an act by which a named sum of money has been set apart in the treasury and devoted to the payment of a particular claim or demand. This last definition is approved by the Supreme Court of Nevada in *State* v. *La Grave,* 23 Nev. 25 (41 Pac. 1075, 62 Am. St. Rep. 764). The opinion in *State ex rel. Norfolk Beet-Sugar Co.* v. *Moore,* 50 Neb. 88 (69 N. W. 373, 61 Am. St. Rep. 538), after quoting from these authorities, says:

"It will be observed that each of these definitions includes as one of its requisites certainty as to the amount appropriated."

On another point of construction, Section 4 of Article IX of the Constitution was before this court in *Shattuck* v. *Kincaid,* 31 Or. 379, 380 (49 Pac. 758), where in a well-considered opinion by Mr. Justice WOLVERTON it is held:

"An 'appropriation' is a setting aside or designation of particular funds for the discharge of certain definite and specified obligations, and may relate to a fixed amount of liability or to one that is continuing."

The following quotation is there made from the case of *Ristine* v. *State of Indiana,* 20 Ind. 328:

"An appropriation, as applicable to the general fund in the treasury, may, perhaps, be defined to be * * an authority from the legislature, given at the proper time, and in legal form, to the proper officers, to apply sums of money out of that which may be in the treasury in a given year to specified objects or demands against the state."

The opinion goes on to say:

"No particular expression or set form of words is requisite or necessary to the accomplishment of the purpose, and the appropriation may be prospective as well as *in praesenti;* that is, 'it may be made in one year of the revenues to accrue in another or future years, the law being so framed as to address itself to such future revenues': *Humbert* v. *Dunn,* 84 Cal. 57 (24 Pac. 111); *Proll* v. *Dunn,* 80 Cal. 220 (22 Pac. 143). And in every instance it becomes a question of legislative intent to be gathered under the settled rules of interpretation from the language employed, the context, the necessity for the enactment, and purpose to be accomplished, considered in the light of contemporaneous circumstances."

In the instant case the defendants contend that the legislature did make an appropriation by law.

Section 1 of Chapter 287, Laws of 1915, creates the board of fish and game commissioners and provides for the appointment of members, and its organization. Section 3 of the act is as follows:

"Said state board of fish and game commissioners or a majority thereof, shall have full power and authority to enforce all laws of the State of Oregon respecting for the protection, preservation and propagation of fish, game animals, game and nongame birds within the state. They shall have the exclusive power to expend for the protection, preservation or propagation of fish and game, all funds of the State of Oregon acquired for the protection, preservation or propagation of fish and game arising from state appropriations, licenses, gifts or otherwise; * * Said state board of fish and

game commissioners shall have full power and authority to use so much of the state funds as may be necessary for the acquisition of lands, water rights and easements, and other property; and for the construction, maintenance, operation and repair of fish hatcheries and other means and appliances for the protection and propagation of fish and game in the State of Oregon. * * "

Paragraph "G" of Section 11 of the act reads in part thus:

"All moneys collected by the county clerk shall, on the last day of every month, be forwarded to the state treasurer, who shall deposit such amounts in the general fund and credit the same to the protective game fund account, and the state treasurer shall keep a separate and distinct account of all such moneys so received under the title of the game protective account, and shall at any and all times pay any and all warrants drawn and issued under the directions of the state board of fish and game commissioners as herein provided, after the same shall have been duly audited by the Secretary of State as herein provided, to the full amount of the money so credited to said game protective fund account, and in no instance shall the said state board of fish and game commissioners issue warrants in excess of the amount then and there credited to the said game protective fund account. * * "

Paragraph "H" thereof provides:

"All moneys credited to the game protective fund account shall be used for the protection and propagation of game and game fish within the State of Oregon, under the direction of the state board of fish and game commissioners and under the administrative control of the state game warden or such other officer or officers as may be vested with the authority to enforce the laws of this state for the protection and propagation of game and game fish, and for the protection and propagation of game animals, game birds, nongame birds and game fish within the State of Oregon."

Chapter 257, Laws of 1915, as amended by Chapter 243, Laws of 1917, was enacted to provide a more simple method of bookkeeping with respect to the special funds in the state treasury. Sections 1 and 2 of that act provide for the turning of numerous special funds into the general fund, and Section 3 enacts:

"Where any law provides that the proceeds arising from the levy and collection of any millage tax or from any license or other fee exacted by law, or that the moneys derived from any source whatever other than those excepted in Section 1 of this act, shall be paid into the state treasury and by the state treasurer placed to the credit of a special fund other than the general fund to be used for carrying out the provisions of the particular statute creating and authorizing the same, or for any other purpose which may be authorized by law, the amount of any such payment or payments so made into the state treasury, and the amount of any mileage tax levy, shall constitute and be considered as and are hereby made an appropriation of such sums or amounts from the general fund of the state, for the purpose of carrying into full force and effect the specific provisions of the particular law exacting the payment of the same and providing for the payment thereof into the state treasury, and in the same manner and to the same extent as therein provided. * * *"

The defendants contend that in legal effect and within the meaning of Section 4 of Article IX of the Constitution, this Section 3 is an appropriation to the use and benefit of the fish and game commission of any and all moneys derived from the payment of hunting and angling license fees and fines under Section 11 of Chapter 287, Laws of 1915.

1. It must be conceded that such fees and fines when collected are to be paid to the state treasurer, who shall place them in the general fund under the title of the "Game Protective Fund Account," and it is made

his duty to pay all warrants drawn on such fund by the authority of the fish and game commission, after the same shall have been duly audited by the Secretary of State, to the full amount of that fund. The law expressly provides that the commission shall not issue any warrants in excess of "the amount then and there credited to the said game protective fund account." Paragraph "H" of Section 11, Chapter 287, Laws of 1915, requires that all such moneys shall be used for the protection and propagation of game birds and game fish under the direction of the commission, "and for the protection and propagation of game animals, game birds, nongame birds and game fish within the State of Oregon." It was the evident purpose and intent of the legislature to invest the commission with a discretionary power for the protection and propagation of game within the state, and that the money derived from such fees and licenses, subject to the approval of the legislature should be expended by the commission.

2. The authority to make an appropriation is vested exclusively in the legislature, and no commission or individual has any power whatever to expend public money without a legislative appropriation therefor. But Section 3 of Chapter 243, Laws of 1917, specifically enacts that—

"The amount of any such payment or payments so made into the state treasury, and the amount of any millage tax levy, shall constitute and be considered as and are hereby made an appropriation of such sums or amounts from the general fund of the state, for the purpose of carrying into full force and effect the specific provisions of the particular law exacting the payment of the same."

Chapter 287, Laws of 1915, provides for the payment of hunting and angling license fees which shall

thereafter be placed to the credit of the "Game Protective Fund Account" by the state treasurer and for the drawing of warrants upon that fund by the commission when the same have been audited by the Secretary of State. The complaint alleges that "the members of the state board authorized the purchasing of a game farm in Lane County for the propagation of Chinese pheasants" and avers the employment of a caretaker and the payment of operating costs of the farm; in other words, it appears upon the face of that pleading that the money in question is to be expended for the protection and propagation of game birds within the state. There is no allegation of any fraud in the transaction or that the price is unreasonable.

3. Although according to the weight of authority the amount of an appropriation must be definite and certain, and the sum is not specified in the act in question, it becomes definite and certain when the moneys from such sources are collected and turned in to the state treasurer. All of such revenues shall be appropriated, under the terms of the statute. That is the effect of the decision in *State* v. *Moore,* 50 Neb. 88, 98 (69 N. W. 377, 61 Am. St. Rep. 538), where it is said:

"An appropriation may be specific, according to any of the definitions heretofore given, when its amount is to be ascertained in the future from the collection of the revenue."

In *People* v. *Miner,* 46 Ill. 384, on the same question it was held:

"There is no force in the objection that the appropriation is for no certain amount. * * It is not essential or vital * * that it should be an amount certain and ascertained prior to the appropriation."

On the same point in *State* v. *Searle,* 79 Neb. 111, 117 (112 N. W. 380, 382), the opinion says:

"No matter what the valuation of the grand assessment-roll may be, the rate of taxation is fixed, and it is merely a question of computation to determine what the tax will yield."

This doctrine is founded upon the maxim, *"Id certum est quod certum reddi potest."* So, in the instant case, when collected and paid over to the state treasurer, the amount of the license fees is annually made definite and certain.

Assuming that the act of 1917 is an appropriation within the meaning of Section 4 of Article IX of the Constitution, should it be construed as a continuing appropriation, and, if so, for how long? And did the legislative assembly of 1917 have authority to make an appropriation of such funds for the year 1919? Those are the vital questions. It is a matter of common knowledge that Congress has made a large number of continuing appropriations under the identical provision in the federal Constitution. In Section 4 of Article IX of our organic law there is no limit upon the time for which an appropriation may be made. In 36 Cyc., page 893, we find:

"In the absence of a constitutional prohibition, the legislature may make continuing appropriations; that is, those the payment of which is to be continued beyond the term or session of the legislature by which they are made. But in several states the Constitutions provide that no appropriations shall continue in force longer than for a designated period. Even under such a provision, however, unless expressly so provided, it is not necessary that the money appropriated should be actually drawn from the treasury during the time limited, although the expense must be incurred or the claim arise during such period."

Under a constitutional provision identical with our own, the Supreme Court of California, in an exhaustive

opinion in the case of *People* v. *Pacheco,* 27 Cal. 175, 218, said:

"In our Constitution, as we have seen, there is no restriction upon the power of taxation, or upon the objects, or the time for which appropriations may be made, except that 'no appropriation for a standing army shall be for a longer time than two years.' As to all other objects, so far as any constitutional restriction is concerned, it may as well be for twenty as for two years. This may have been an unwise omission, and yet it does not seem to have been an oversight, for the attention of the framers of that instrument was directed to the subject, when the two years limitation was imposed upon 'appropriations for a standing army.' "

The Colorado Constitution is also identical upon the point involved here, and the legislature of that state on a resolution submitted to the Supreme Court the question of legality of continuing appropriations. The opinion of the court is found *In Re Continuing Appropriations,* 18 Colo. 192 (32 Pac. 272), as follows:

"As to those appropriations designated in the question as 'continuing appropriations,' that is, those the payment of which is to be continued beyond the next biennial session of the legislature, we see no constitutional objection thereto. The power of the legislature, except as otherwise restricted by the Constitution, is plenary over the entire subject. * * Under a similar provision with reference to appropriations to be found in the federal Constitution, such continuing appropriations have been made by Congress, apparently without question, and it has been resorted to in this state from the time of the inception of the state government. When such appropriations are for the whole or for a definite part of a certain special fund, we are of the opinion that they furnish sufficient authority for the disbursement of such fund. * * The fact that in several of the states of this Union it has been found

necessary to inhibit the making of continuing appro-
priations furnishes an argument against the policy of
such laws that will undoubtedly be given due weight by
the legislature; but with the policy or expediency the
courts have nothing to do, the power of the legislature
to make the appropriations being conceded.''

In *Fleckten et al.* v. *Lamberton,* 69 Minn. 187, 191
(72 N. W. 65, 66), it is said:

''There is nothing in counsel's .position that, because
the life of the legislature continues for only two years,
therefore it can make no standing appropriations, or
appropriations covering a longer period of time than
such two years. Section 9 of Article IX is no warrant
for any such position.''

The section of the Minnesota Constitution to which
reference is made is the same as our own.

4–6. Analyzing the different acts of the legislature,
we find that it has sanctioned the collection of certain
fishing and hunting license fees, which shall be paid to
county clerks and by them turned over to the state
treasurer, who shall keep them in a separate fund
known as the ''Game Protective Fund Account.'' It has
created a fish and game commission and vested it with
discretionary power ''to expend for the protection, pre-
servation and propagation of fish and game, all funds
of the State of Oregon acquired for the protection,
preservation or propagation of fish and game, arising
from state appropriations, licenses, gifts or other-
wise,'' and such commission ''shall have full power
and authority to use so much of the state funds as may
be necessary for the acquisition of lands, water rights
and easements and other property.'' Vesting the com-
mission with such authority is a matter in the discre-
tion of the legislature, as to the wisdom of which
people may differ in opinion. But that is a matter

upon which this court has no right to express its views. The purchase of the farm is germane to and within the purview of Chapter 257, Laws of 1915. The fund is not derived from taxation, and, although it is true that when collected it becomes public money, the power of the commission is limited to the amount thereof. Section 3 of Chapter 257, Laws of 1915, is in the nature of a continuing appropriation of the amount of such fund, which may be' repealed by any ensuing legislature.

Carrying out the spirit and intent of the different legislative acts to which reference has been made, we hold that the issuing and payment of the warrant from the funds specified are within the authority conferred upon the fish and game commission, and that the demurrer should have been sustained. The decree of the Circuit Court is reversed and the suit is dismissed.

REVERSED.    SUIT DISMISSED.