JOSEPH RISTINE, Auditor of State *v*. THE STATE OF INDIANA *ex rel*. THE BOARD OF COMMISSIONERS OF THE SINKING FUND.

PAYMENT OF INTEREST ON STATE DEBT.—Neither section 16, 1 G. & H. 650, nor section 3, 1 G. & H. 503, nor any other subsisting law of the State of *Indiana*, authorizes the State officers, or any of them, to pay the interest on the State debt, without a specific appropriation by law of the money necessary to pay the same; nor does either of said sections, or any other subsisting law of the State, make such appropriation.

REVENUE OF STATE.—All revenues of the State, designed for the liquidation of her indebtedness, must be first paid into the State treasury, and then withdrawn therefrom in the manner prescribed by law.

No money can lawfully be drawn from the treasury, but in pursuance of appropriations made by law.

APPROPRIATION.—An appropriation, as applicable to the general fund in the treasury, is an authority from the Legislature, given at a proper time, and in legal form, to the proper officers, to apply sums of money out of that which may be in the treasury, in a given year, to specified objects, or demands against the State.

An appropriation of money to a specific object is an authority to the proper officers to pay the money, because the Auditor would be thereby authorized to draw his warrant for such money, and the

Ristine, Auditor, &c. *v.* The State of Indiana ex rel. The Board, &c.

treasurer to pay such warrant, if he had appropriated money in the treasury.

An appropriation may be prospective.

APPEAL from the *Marion* Circuit Court.

PERKINS, J.—*Indiana* owes a foreign debt contracted anterior to the war, the aggregate annual interest on which is 320,000 dollars, payable *semi*-annually, on the first days of *January* and *July*, in the city of *New York*, to such persons as may hold her bonds. To the punctual payment of the principal and interest of this debt the faith of the State is solemnly pledged; and the non-payment of either, when due, would cover the State with dishonor.

The money to pay these demands, at the proper times, must be provided by the State, and placed in her treasury, before it can thus be applied in payment. 1 G. & H. 645.

The modes that may be adopted by the State to place the necessary money in the treasury, preparatory to payment of demands against her, are taxation, borrowing, &c.; Const. art. 10, sec. 5; but the money raised by either mode must be placed in the State treasury before it. is applied in payment of debts. This is expressly required by statute. 1 G. & H., p. 645. The money must be paid to the several creditors of the State, by the Agent of State, in the city of *New York*, but it must be transferred to him, to be thus used, from the treasury of the State, at *Indianapolis*, by the State Treasurer. Such is the statute. In the Code of 1843, p. 292, we find this section:

"SEC. 20. The Treasurer shall also advance, from time to time, to the State Agent, such sums of money as shall be necessary to pay the principal and interest on the public debt," &c.

By the act of 1859, it is provided that, "at some convenient period, prior to the falling due of the interest on the for-

eign debt of the State, payable at, &c., the Treasurer shall, &c., transmit to *New York,*" &c.   This section is incomplete, in this, that it does not say to whom, in *New York,* the Treasurer shall transfer the money; but when we look at the acts prescribing the duty of the Agent of State, we find the defect may be conjecturally supplied; nor does the section apply or directly authorize the application of the money in payment of any thing.   The question now arises how, upon what authority, what condition precedent, can the Treasurer make the transfer or advance the funds?   The law explicitly answers the question.   By the Code of 1843, p. 252, it was enacted:

"SEC. 21.   Such advances shall be made on requisitions drawn by the Auditor of public accounts on the Treasurer of State, which shall be numbered, and the amount thereof charged, by said Auditor, to the Commissioner or Agent receiving the same, in a book to be kept for that purpose; and for the amount so charged, the Commissioner or Agent shall settle with the Auditor," &c.

"SEC. 22.   For the amount of satisfactory vouchers produced at such settlements, the Auditor shall issue warrants with which shall be redeemed the requisitions before issued; and should any amount yet remain in any such Agent's hands, he shall refund the same to the treasury, unless the same shall be required for a new expenditure, when a new requisition shall be obtained therefor."

Under this statute, then, a reasonable time before the interest fell due, the Agent of State procured from the Auditor a requisition on the Treasurer, upon which the latter transmitted the money to the Agent, which requisition was afterward redeemed by a warrant.   But in 1859 the law seems to have been changed to this extent, that the warrant issues in the first instance in place of the requisition, thus simplifying the transaction without any possible increase of hazard to the

Ristine, Auditor, &c. v. The State of Indiana ex rel. The Board, &c.

public fund. Sec. 7 of the act of 1859 (1 G. & H. 647) declares that "the Treasurer of State is expressly prohibited from paying any money out of, or transferring any money from, the treasury of State, except upon the warrant of the Auditor of State." It is thus plain beyond a doubt, that the Agent of State must receive the money for the payment of our interest, whether that money may have been raised by taxation, borrowing, or otherwise, from the treasury of the State, and that the Treasurer can not now, nor could he ever, transfer or advance that money to the Agent, except upon authority previously given by the Auditor of State, a warrant from him, or a requisition, the equivalent of a warrant.

This settles the question as to the power and duty of the Treasurer, because, by sec. 3 of the act of *February* 22, 1861, it is made a criminal offence for the Treasurer to pay out money in any other manner than as prescribed by law. 2 G. & H., p. 456. It now devolves upon us to ascertain when the Auditor is authorized to draw his warrant.

The Constitution of the State provides, art. 10:

" Sec. 2. All the revenues derived from the sale of any of the public works belonging to the State, and from the net annual income thereof, and any surplus that may, at any time, remain in the treasury, derived from taxation for general State purposes, after the payment of the ordinary expenses of the Government, and of the interest on bonds of the State, other than bank bonds, shall be annually applied, under the direction of the General Assembly, to the payment of the principal of the public debt.

" Sec. 3. No money shall be drawn from the treasury, but in pursuance of appropriations made by law."

Section two, it will be observed, directs that the funds shall be annually applied " under the direction of the Legislature," showing that there must be under that section a legislative direction relating to each year; and section three

332 SUPREME COURT OF INDIANA.

Ristine, Auditor, &c. v. The State of Indiana ex rel. The Board, &c.

points out how the legislative direction is to be given, viz., by an appropriation of the money. And sec. 8 of the act of *February* 22, 1861, (Acts 1861, p. 112,) enacts thus:

"If the Auditor of State shall draw any warrant upon the Treasurer of State, unless there be money in the treasury belonging to the particular fund upon which the same is drawn, to pay the same, and in conformity to appropriations made by law, he shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined in any sum not less than 100 dollars nor more than 1000 dollars, and be imprisoned in the county jail not less than one nor more than six months." 2 G. & H., p. 457.

This act of 1861, is defective in not defining what an appropriation is, as a guide to the Auditor in regulating his action; but the very fact that the Legislature enacted no definition argues that they must have supposed that an appropriation was something palpable, distinct, recognizable, clear in its own expression so that it could not be mistaken.

Can it be possible that this thing of an appropriation, so important as to be made the subject of a distinct constitutional provision, and the mistaking of it by an officer, a criminal offence is anything, everything, and nothing, according to circumstances; something to be ascertained by conjecture, or created by imagination?

As, then, the Treasurer can not transfer the money to the State Agent without a warrant from the Auditor, and the latter can not issue the warrant without an appropriation, the whole question in the case turns upon the existence of that fact.

The Auditor necessarily decided this question for himself, on the application for the warrant, and he decided against the existence of an appropriation, and refused the warrant. Thereupon this proceeding was instituted against him by creditors to compel the issue of the warrant. The Court be-

Ristine, Auditor, &c. v. The State of Indiana ex rel. The Board, &c.

low ordered the warrant to issue. The Auditor appealed. The application for the writ was not premature, and if there was an appropriation on which it might issue, the judgment of the Court below was right.

Was there an appropriation? There was none in any act purporting to be an appropriation bill. Can one be construct-ively deduced out of other acts found in the statute book?

This leads to the inquiry, what constitutes an appropriation within the provision of the constitution prohibiting payment without one. What is meant by this constitutional inhibi-tion, this limitation upon executive power; why was it made a part of the paramount law of the State? Why were not the executive and administrative officers left to their own dis-cretion in the use of the public revenues? History answers these questions. The restraints contained in all the Ameri-can State constitutions, and in the constitution of the *United States*, upon the powers of the different departments of Gov-ernment were imposed with a view to provide against some abuse of such powers which had been practiced in *England*, the country from which our fathers came, the country, in-deed, from which they fled to escape the evils flowing from abuses of the powers of Government. Most of the provis-ions of our American constitutions, containing the restraints mentioned, were taken substantially from certain solemn de-claratory acts or resolutions of the British Parliament, passed at certain times in the history of Great Britain, when the people claimed and were asserting their rights, or were at-tacking abuses, and which acts were regarded as enunciating great fundamental principles, the observance of which by the Government, would secure their rights and correct those abuses. *Magnu Charta* extorted from *King John*, the peti-tion of right from *Charles the First;* the *habeas corpus* act un-der *Charles the Second;* the bill of rights declared to *William* and *Mary*, after the abdication of *James the Second*, and the

act of settlement of 12 and 13, of *William the Third*, are the principal of the great acts declaratory of, and designed to secure and perpetuate the liberties of Englishmen.

Among the principles of Government thus settled in Great Britain was this: That the King, or Executive Department, should not use the money in the National Treasury except as specially appropriated by Parliament. In the earlier period of English history, it appears that the King both levied or imposed, and expended the public revenues by his own authority. He was thus independent of his people, and, as a matter almost of course, was tyrannical and wasteful in administration. See 1 Black. Comm., chap. 8.

The first important check on this money power of the King was the establishment of the great principle "that without the sanction of parliament no tax of any kind can be imposed." This principle rendered the King dependent upon the legislative power for the amount of money he might expend, but still left it to his discretion, or that of his officers, to spend the money raised by Parliament at will; that is, to apply it to such claims made upon the treasury, as he or they chose, to the neglect of others. The money was used where self gratification, favoritism and corruption could be best accomplished while just demands upon the treasury were left unpaid. "While *Danby* was at the head of the finances, the creditors had received their dividends, though not with the strict punctuality of modern times; but since the victory won by the Court over the Whigs, not a farthing had been paid, and no redress granted to the sufferers till a new dynasty established a new system." Macauley, vol. 1. p. 224. Till that was done the public creditors, he says, were plundered, and the public revenues wasted in extravagance and corruption by the Court. The new system referred to was established at the revolution of 1688, and was regarded as of

the highest importance. What it was is thus stated in Crea-sy on the English Constitution, p. 293:

"In addition to this important guarantee, (the mutiny act,) for the regular meeting of Parliament, a system of settling the royal revenue was established in *William's* reign, which necessitated the observance of the same constitutional prin-ciple. The House of Commons then determined no longer to vote to the crown certain general large sums of revenues to be applied to particular purposes, according to the royal discretion; but they appropriated specific parts of the reve-nue to specific purposes of government. This principle had been previously attempted, but it is only since 1688 that it has been strictly enforced."

Says *Mr. Hallam*, in his Constitutional History, p. 555: "This great and fundamental principle, as it has long been justly considered, that the money voted by Parliament is ap-propriated, and can only be applied, to certain specified heads of expenditure, was introduced, as I have before mentioned, in the reign of *Charles the Second*, and generally, though not in every instance, adopted by his Parliament. The unworthy House of Commons that sat in 1685, not content with a need-less augmentation of the revenue, took credit with the King for not having appropriated their supplies; but, from the revolution, it has been the invariable usage. The lords of the treasury, by a clause annually repeated in the appropria-tion act of every session, are forbidden, under severe penal-ties, to order by their warrant any moneys in the exchequer, so appropriated, from being issued for any other service, and the officers of the exchequer to obey any such warrant. This has given the House of Commons so effectual a control over the executive power, or, more truly speaking, has rendered it so much a participator in that power, that no administra-tion can possibly subsist without its concurrence. It is to this transferrence of the executive government, (for the phrase

is hardly too strong,) from the Crown to the two Houses of Parliament, and especially the Commons, that we owe the proud attitude which *England* has maintained since the revolution, so extraordinarily dissimilar, in the eyes of *Europe*, to her condition under the *Stuarts.*"

The system established was, that all the money in the treasury was to be specifically appropriated and specifically applied. This new and important principle, as English historians call it, thus practically established in that country, is adopted in this State as a part of our fundamental law. "No money shall be drawn from the treasury, but in pursuance of appropriations made by law." And the abuse to be corrected by the establishment of the principle, was the exercise of official discretion in paying out the public money. The purpose to be accomplished, was the giving to the legislative power alone the right, and imposing upon it the duty, of designating, periodically, the particular demands against the State, or other objects, to which the moneys in the treasury shall be, from time to time, applied, and the amount to each. Opinions Att'y Gen., Vol. II., p. 670. And it is a great and important principle not to be lightly violated. If it is doubtful whether the legislative power has exercised its function in this particular, the officers of State should not take the money from the treasury. See *The People* v. *Schoonmaker*, 3 Kernan, N. Y. R. 238. It may be laid down as a maxim in constitutional government, that officers, as a general rule, should not assume to exercise doubtful powers. Such assumption is the first step in usurpation, in setting at naught, in fact, the Constitution. That step should not be taken; for if it is, there is danger that it will be followed by others in the same direction, till the constitutional prohibition is entirely trodden under foot. There is no necessity that the State officers should assume doubtful powers. There is no necessity that the Court, in this case, should attempt to bend

the constitutional rule in order to create a justification to those officers in the assumption of such powers. The Constitution has provided against this necessity by authorizing the Executive of the State to call the Legislature together to supply deficiencies in legislation. There is, hence, no necessity that the officers of State should exercise questionable authority, and disrespect for the restraints of the Constitution be thus encouraged, or the credit of the State be dishonored. The question then is, is there an appropriation by law of the money to pay the *July* interest on the State debt? If there is, the proper State officers can pay it. If there is not, they can not legally do so. What, then, is an appropriation by law? What is a definition of it? Judicial decisions are not cited, to any extent, on this point. It has rarely arisen in the courts of this State; and yet it is one of great importance in the correct administration of the Government, and ought to be definitely settled, and, when it is so, carefully observed. There are some things which, plainly enough, are not severally an appropriation. A promise by the Government to pay money, is not an appropriation. A duty on the part of the Legislature to make an appropriation, is not such. A promise to make an appropriation, is not an appropriation. The pledge of the faith of the State, is not an appropriation of money with which to redeem the pledge. Usage of paying money in the absence of an appropriation, can not make an appropriation for future payment. The question is to be settled upon the meaning of the Constitution. Usage may be evidence of the meaning the administrative officers have put upon that instrument, and, as such, entitled to respectful consideration, but it is no binding interpretation; and the late usage was, in fact, probably commenced without much consideration. See *Newell* v. *The People*, 3 Selden, p. 94.

An excellent illustration of what constitutes an appropriation is presented in the summary of the legislation of Con-

gress upon the subject, found in Brightly's Digest, p. 42, under the title "Appropriations." That legislation is an exposition by the Legislative and Executive Departments of the Federal Government of the requirements of the clause in the Federal Constitution, that "no money shall be drawn from the treasury, but in consequence of appropriations made by law." See Brightly, p. 5, note M, and *McConnell* v. *Wilcox*, 1 Scamm. (Ills.) R. 359. An appropriation may be made in different modes. It may be made by an act setting apart and specially appropriating the money derived from a particular source of revenue to a particular purpose. Our swamp land act is of this character. 1 G. & H. 597; *Dodd* v. *Miller*, 14 Ind. 433; *Lange* v. *Stover*, 19 Ind. 175.

*Smith*, in his Wealth of Nations, speaking of exchequer bills, &c., proceeds, p. 388, "when this resource is exhausted, and it becomes necessary, in order to raise the money, to assign or mortgage some particular branch of the public revenue for the payment of the debt, government has, upon different occasions, done this in two different ways. Sometimes it has made this assignment or mortgage for a short period of time only, a year, or a few years, for example, and sometimes for perpetuity. In the one case, the fund was supposed sufficient to pay, within the limited time, both principal and interest of the money borrowed. In the other, it was supposed sufficient to pay the interest only, or a perpetual annuity equivalent to the interest, government being at liberty to redeem, at any time, this annuity, upon paying back the principal sum borrowed."

Appropriation, as applicable to the general fund in the treasury, may, perhaps, be defined to be an authority from the Legislature given at the proper time, and in legal form, to the proper officers to apply sums of money out of that which may be in the treasury, in a given year, to specified objects or demands against the State.

Ristine, Auditor, &c. v. The State of Indiana ex rel. The Board, &c.

An appropriation of the money to a specified object would be an authority to the proper officers to pay the money, because the Auditor is authorized to draw his warrant upon an appropriation, and the Treasurer is authorized to pay such warrant if he has appropriated money in the treasury.

And such an appropriation may be prospective, that is, it may be made in one year, of the revenues to accrue in another or future years, the law being so framed as to address itself to such future revenues.

So a direction to the officers to pay money out of the treasury upon a given claim, or for a given object, may, by implication, include in the direction an appropriation.

But the pledge of the faith of the State that revenues shall be provided in future and applied to the discharge of given claims against the State, does not authorize the officers of State, without further legislative direction, to apply the general fund in the treasury to the payment of those claims; it is not an appropriation of the money in the general fund. We think there can be no mistake as to the correctness of this proposition. If it is not true, then we are certainly thrown back upon that very official discretion which *England* abrogated at the revolution of 1688, and which it was the design of our constitution to abrogate here. Such pledges are solemn obligations upon the people and Legislature of a State, but they are not legislative directions to the officers, temporarily in position, to pay out the given funds without further appropriation by the Legislature. Such pledges, in language of Chief Justice *Lowrie*, in *Sunburry, &c., Co.* v. *Cooper,* are " to be enforced by means of the moral sense of the community operating upon the Legislature, and by means of the moral sense of the civilized world operating upon both the people and the Legislature—an influence and responsibility to which all States are subject." 7 Am. L. Reg. 158; S. C. 9 Penn. State Rep. 278.

In exact accord with this decision is, as we understand it, the case of *Clendenin* v. *Frazier*, 1 Ind. 553.

The act upon which that decision was made, is found in the general laws of the State for 1843, at page 64.

That all the constitutional and statutory provisions, except one, relied upon in this case as appropriations for the payment of interest on the public debt are but State pledges is most satisfactorily shown in the opinion of Judge *Hanna* in the case of *The State, &c.* v. *Ristine*, at this term, and criticism upon those sections need not be repeated here.

It is freely admitted; it is beyond cavil, that an obligation is created by such pledges on the part of the State, to make an appropriation; but, in the language of Judge *Johnson*, in the great case of *Newell* v. *The People*, 3 Selden (N. Y.) Rep. 9, on page 104, "an appropriation is always necessary to effect actual payment, though the obligation is as complete without the appropriation as with it."

Thus, the *United States* has, from time to time, in the course of her history, entered into treaty with foreign nations whereby she has engaged most solemnly to pay specified sums of money, at fixed times, which treaties, the constitution of the *United States* declares, were "the supreme law of the land;" (Art. 6, sec. 2;) and yet no instance is within our recollection where it has been contended for a moment that executive or administrative officers could pay those exactly specified sums thus due, and on the payment of which the peace of the nation might depend, without a further appropriation by Congress of the money, unless it had been thus appropriated in advance of the treaty, as has sometimes been the case. We cite, as an example, the treaty with *Mexico*, concluded *February* 2d, 1848, (acts of Congress, 1848, p. 260,); and the appropriation for its execution. (Acts of Congress, 1849, p. 72; See 1 Benton's Deb., p. 625.) Law. Wheat. Int. Law, pp. 454, 458, notes.

Ristine, Auditor, &c. v. The State of Indiana ex rel. The Board, &c.

We excepted, above, one provision of the statute as not being a State pledge. It is the 16th section of the act of 1859, which act is entitled "an act to provide a treasury system for the State of *Indiana*, for the manner of receiving, holding and disbursing the public moneys of the State, and for the safe keeping of the public moneys." 1 G. & H. p. 645.

We have already copied the section above, but we here set it forth again. It is this:

"At some convenient period, prior to the falling due of the interest on the foreign debt of the State, payable at *New York*, the Treasurer shall, without making any discrimination, draw on the bank notes in the treasury an amount in specie sufficient to pay said interest, which he shall transmit to *New York* by express, or otherwise, as may be deemed most safe; but any bank or banks on whose notes specie is thus demanded, may redeem such notes to the extent of such demand, by draft on *New York*, payable fifteen days preceding the day of payment of such interest, and without any premium of exchange, and giving ample security to the Treasurer for the prompt payment thereof."

The title of the act of which this section forms a part, says nothing about appropriations; and the section contains no directions as to whom the money is to be sent, even; nor what shall be done with it after it reaches the city, but it does direct the Treasurer very particularly how and when he shall transfer money to *New York*, the kind of funds, &c.; and it is so clearly shown in the opinion of Judge *Hanna*, above cited, that the section reaches no further than such directions as to manner, &c., where a previous appropriation and warrant authorize him to make a transfer, that further elucidation is unnecessary; but as so much stress is laid upon the section, we add a remark touching it, to what has been said. It is not a direction addressed to the two officers, the Auditor and Treasurer, who must concur in paying a debt, but to

the Treasurer alone, who can not perform the act required of him without a previous warrant, and it directs him in the discharge of his separate duties after a warrant from the Auditor has been furnished him, which warrant can not issue till after an appropriation has been made. The section was enacted under the title prescribing the *manner* of keeping and transferring money. Perhaps the appropriation of money to be transferred might be so properly connected with the subject of the title as to render valid an appropriation section in the act, had one been placed in it. This we need not decide. The question is, did the Legislature intend that that section should constructively include an appropriation? As one means of answering this question, let us suppose that in the act of which that section forms a part, prescribing the manner of transferring money to *New York*, the Legislature had added, immediately following section 16, as follows:

"Sec. 17. That the sum of 320,000 dollars is hereby appropriated to pay the interest on the public debt for the year 1859, to be transmitted, &c., in the mode prescribed by law."

Would anybody then have contended that section 16, also, contained an appropriation of the same sum of money? We think not. Well, just this, in effect, was done by the Legislature, for four days after the passage of section 16, and before the Treasurer was to act under it, the Legislature enacted another separate section, under the proper title, making the appropriation. This was the clearest kind of cotemporaneous exposition. See the opinion of Judge *Hanna*, *supra*. Now, if section 16 was not an appropriation section when the Legislature enacted it, it has not become one since that time. We will briefly notice one other section of the statute.

The third section of an act entitled "an act in relation to applying certain funds therein named to the payment of the public debt," approved *January* 18, 1852, is as follows: "That all the revenues derived from the sale of any of the public

works belonging to the State, and the net annual income thereof; and any surplus that may remain in the treasury derived from taxation for general purposes, after paying the ordinary expenses of government and interest on the State stocks, other than the original bonds not surrendered, and the State Bank bonds, be applied towards paying the principal of the State debt, as hereinafter provided." (1 G. & H. 503,) re-enacted. (Acts 1861, p. 108.)

" This section professes to dispose of any surplus there is in the State treasury after paying the ordinary expenses of the State government and the interest on the State debt, but it does not make appropriations for either of those purposes. The money in the treasury is first to be applied to the expenses of the government, next to the payment of the interest on the State debt, and finally to the principal of the State debt.

"If this section appropriates money to pay the interest, it is equally an appropriation to pay the expenses of the State government, and no legislation is necessary for any State expense.

"If it be answered to this, that it can not have this effect, because the expenses of the State can only be ascertained by legislation; the reply is immediate and sufficient, that if the State expenses can not be ascertained because the Legislature have passed no appropriation bill, then this section can not be an appropriation of interest, for it is not to be paid until after the ordinary expenses of the State government, and until that is ascertained, it can not be known, in any legal form, whether there will remain any money in the treasury after the ordinary expenses are paid.

" This section clearly does not appropriate any money upon either of the two first mentioned objects."

By the section, if it is an appropriation, *all the moneys* in the treasury are appropriated first to the expenses of the

State government, and the State officers are left to determine what should be considered as such expenses, and would be justified in paying out every dollar on State expenses, such as extra sessions of the Legislature, increased militia expenses, arsenals, now ordinary objects of State expenses, &c., and as the State expenses run through the whole year and no interest could be paid till all the State expenses were paid, there could be no payment, under this section, of the *July* interest, which comes *before*, not *after* the paying of the expenses of the government. The construction of this section contended for, revives the worst habit of official discretion in the use of the public moneys practiced in the days of the *Tudors* and *Stuarts*. The section was never intended but to assert a principle, to make a pledge.

If the section had specified a fixed sum which might be applied to the expenses of the State, as it would have done had it been intended to make an appropriation, especially from year to year, for all time, then the officers could have known, at *July*, whether there was money in the treasury to meet other and later appropriations for interest, &c.

An act of Congress illustrates this, and furnishes an example of a continuing and future appropriation. We extract from the act of Congress passed *August* 4, 1790—found in 1 United States Statutes at large, 139: Section 1, be it enacted, "That reserving out of the moneys which have arisen since the last day of *December* last past, and which shall hereafter arise from the duties on goods, wares and merchandise imported into the *United States*, and on the tonnage of ships or vessels, the yearly sum of six hundred thousand dollars, or so much thereof as may be appropriated from time to time, towards the defence of the government of the *United States*, and their common defence, the residue of the said moneys or so much thereof as may be necessary, as the same shall be received in each year, next after the sum reserved as afore-

The State ex rel. The Board of Com., &c. v. Ristine, Auditor, &c.

said, shall be, and is hereby appropriated to the payment of the interest which shall from time to time become due on the loans heretofore made by the *United States* in foreign countries; and also, the payment of the interest on such further loans as may be obtained for discharging the arrears of interest thereupon, and the whole or any part of the principal thereof; to continue so appropriated until the said loans, as well those already made as those which may be made in virtue of this act, shall be fully satisfied, pursuant to the contracts relating to the same, any law to the contrary notwithstanding.

*Per Curiam.*—The judgment below is reversed, with costs. Cause remanded, &c.

*Oscar B. Hord,* Attorney General, for the appellant.
*Frederick Rand* and *Reginald H. Hall,* for the appellees.