# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT

OF THE

# STATE OF NEVADA

## OCTOBER TERM, 1907

[No. 1728]

THE STATE OF NEVADA, EX REL. SAM P. DAVIS,
PETITIONER, *v.* J. EGGERS, STATE CONTROLLER OF
THE STATE OF NEVADA, RESPONDENT.

1. . STATE APPROPRIATIONS—NECESSITY. Stats. 1907 (p. 408, c. 185) created
the state industrial and publicity commission, and provided (sec. 3,
p. 409) that the chairman should receive from the state treasury the
sum of twenty-five hundred dollars a year in monthly installments,
and that the members of the commission should be allowed necessary
mileage and traveling expenses on affidavit of the members claiming
the same that the mileage and expenses were actually and necessarily
incurred in official business, etc. *Held,* that the act constituted a suf-
ficient appropriation for the salary of the chairman; but, as it failed
to prescribe any maximum expenditure for traveling expenses, the
act was void in so far as it authorized payment of such expenses by
the state, under the Constitution, art. IV, sec. 19, providing that no
money shall be drawn from the state treasury except under appro-
priations made by law.

ORIGINAL PROCEEDING. Petition for *mandamus* by The
State of Nevada, on the relation of Sam P. Davis, against
J. Eggers, State Controller of the State of Nevada. On
demurrer to the petition. **Overruled. Writ granted.**

The facts sufficiently appear in the opinion.

*Thompson, Morehouse & Thompson*, and *James R. Judge*, for Petitioner:

I. Section 19 of article IV of the Constitution of the State of Nevada provides: "No money shall be drawn from the treasury but in consequence of appropriations made by law." The question has been before the courts in a number of the states as to what language will constitute an appropriation, and it has been invariably decided that no particular form of words is necessary to constitute an appropriation of moneys in the state treasury; it is sufficient that the statute declares the purpose to have the state, or some officer of the state charged with that duty, pay moneys out of the state treasury, and from some designated fund therein. (*McCauley* v. *Brooks*, 16 Cal. 27; *Proll* v. *Dunn*, 80 Cal. 220; *Humbert* v. *Dunn*, 84 Cal. 57; *Irelan* v. *Colgan*, 96 Cal. 413: *Ingram* v. *Colgan*, 106 Cal. 115; *Ristine* v. *State*, 20 Ind. 338; *Campbell* v. *Com.*, 115 Ind. 591; *Carr* v. *State*, 127 Ind. 204, 22 Am. St. Rep. 624; *State* v. *Bordelon*, 6 La. Ann. 68; *Reynolds* v. *Taylor*, 43 Ala. 420; *State* v. *Kenney*, 10 Mont. 485.)

II. The intention of the legislature is to be ascertained from the language of the act and the provisions of the statutes relating to the same subject and the nature of the claim for which the appropriation is made. If it clearly appears from these things that the legislature intended to pay a certain amount at a certain time, and has designated the fund from which the money is to be paid, the appropriation is complete, and payment will be forced by mandate, regardless of form of wording of the act. (*Humbert* v. *Dunn*, 84 Cal. 57; *Irelan* v. *Colgan*, 96 Cal. 413.).

III. "The true test as to whether any particular language in an act is sufficient to make an appropriation is here found. 'To an appropriation, within the meaning of the constitution, nothing is more requisite than designation of the amount and the fund out of which it shall be paid.' If the amount be certain, one of the reasons for the constitutional requirements is complied with, in that the people are enabled to determine how much of their money is to be devoted to the named purpose. The designation of the fund likewise enables the

people to see how much of the moneys set apart to a par-
ticular fund is to be drawn from it and used for the specific
end.   But under our system, countenanced by the custom of
years, it is not necessary in all cases that the act in terms
should name the fund.   The general fund, itself, is defined
to be 'the moneys received into the treasury and not specif-
ically apportioned to any other fund.'   From these moneys
all appropriations are paid which are not made payable out
of any other especially named fund." (*Ingram* v. *Colgan,* 106
Cal. 117.)

*R. C. Stoddard,* Attorney-General, for Respondent:

I.   The act creating the industrial and publicity commis-
sion (Stats. 1907, p. 408) does not carry an appropriation.
It only specifies the amount of money the chairman shall
receive as salary and the manner in which it shall be paid.
Section 3 thereof provides that the salary of the chairman
and the traveling expenses of the commission shall be paid
out of the state treasury.   It does not fix the amount of
traveling expenses nor specify the fund out of which either
the salary of the chairman or the expenses of the commission
are payable.   Section 4 provides that the secretary of said
commission and "such other experts" as may be necessary
may be paid out of such contributions as may be made by
the various counties and by private individuals.   By thus
distinguishing between the different sources from which the
money for the support of said commission may be derived
and the method of paying such salaries and expenses, it is
manifest that the legislature did not intend in this act to
appropriate money for said purposes, but only to provide for
the creation of said commission, fix the compensation of
certain of its officers, and prescribe the manner in which
such compensation and other expenses incidental to its pur-
poses may be allowed and paid, whenever the proper appro-
priations have been made therefor. "No money shall be
drawn from the treasury but in consequence of appropriations
made by law." (Art. IV, sec. 19, Const.)

II.   To constitute an appropriation, there must be money
placed in the fund applicable to the designated purpose.

(*State* v. *LaGrave*, 23 Nev. 26; *Ristine* v. *State*, 20 Ind. 328; *Stratton* v. *Green*, 45 Cal. 149.)

III.   Under Comp. Laws, 1959, 1960, the controller is forbidden to draw any warrant on the treasury except there be an unexhausted specific appropriation to meet the same.   He must keep a separate account under the head of each specific appropriation to show at all times the unexhausted balance of each appropriation.   The foregoing requirements cannot be observed if the act creating a publicity commission be construed as making an appropriation, because there is no specific appropriation upon which a warrant could be drawn; also the accounts could not show an unexhausted balance. Repeals by implication are looked upon with disfavor.   (*State* v. *LaGrave*, 23 Nev. 28, and authorities therein cited.)

By the Court, TALBOT, C. J.:

Under an act approved March 29, 1907, entitled "An act creating and establishing a state industrial and publicity commission, prescribing their duties and compensation, providing funds to be used for the accomplishment of their objects, and other matters relating thereto" (Stats. 1907, p. 408, c. 185), the petitioner was appointed chairman of the commission designated.   Section 3 (page 409) of the act is as follows: "The chairman of such commission shall receive, as compensation for his services, to be paid out of the treasury of the State of Nevada, the sum of twenty-five hundred dollars per annum, payable in equal monthly installments, upon the first day of each and every month, and the other two members shall serve without compensation; *provided, however*, that the chairman and other members of such commission shall be allowed necessary mileage and actual expenses of travel incurred in traveling upon the official business of the commission when it shall appear from the affidavit of the members, or one of the members claiming the same, that such mileage and expenses were actually and necessarily incurred, that the same is just, and was incurred while traveling upon the official business of the commission; such affidavit to be filed with the state treasurer before any allowance can be made for such mileage or expenses."

As the questions involved have been submitted upon a demurrer, the facts stated in the petition may be considered admitted. The petitioner alleges that he entered upon his duties on the 1st day of May, 1907, and acted as chairman of this commission during that month; that by the provisions of the act he is entitled to receive out of the state treasury a salary of $2,500 per annum, to be paid monthly; that he is also entitled to receive and be paid out of the state treasury mileage and expenses actually incurred while traveling upon official business of the commission; that his compensation fixed and allowed by the act for the month of May, 1907, is the sum of $208.33, and his mileage and expenses necessarily and actually incurred in the performance of his official duty for that month amount to $16.50, for both of which sums the state became indebted to him on the 1st day on June; that the provisions of the act make appropriation by the legislature for these sums in accordance with the provisions of section 19, article IV, of the constitution of this state; that these claims had been duly audited and allowed by the state board of examiners; that upon presentation and demand, the respondent, as state controller, has refused, and still refuses, to draw his warrants for these claims, notwithstanding there is ample money in the state treasury. A writ of mandate requiring the issuance of such warrants is demanded. The general appropriation bill contains no provision for the payment of the salary or expenses of the petitioner. It may have been drawn previous to the act designated, which was introduced near the close of the session of the legislature. The question involved is whether the language of section 3 quoted above constitutes an appropriation for the payment of petitioner's salary and expenses, and whether their payment is, by this act, or otherwise, authorized.

Section 19 of article IV of the constitution provides: "No money shall be drawn from the treasury but in consequence of appropriations made by law." A similar provision is found in the federal constitution and prevails in many of the states. In the organic acts of others the word "specific" precedes and modifies the word "appropriations." We will be aided by looking to the history, purpose and reason for these

constitutional enactments before examining decisions of a
number of courts bearing on the proposition presented.   As
the fruit of the English revolution in 1688, which sent the
king to Versailles and changed the succession to the throne,
this safeguard had its origin in the British Parliament when
the people of Great Britain, to provide against the abuse by
the king and his officers of the discretionary power with
which they were vested, demanded that the public funds
should not be drawn from the treasury except in accordance
with express appropriation made by parliament.   This pro-
hibition is so wise that it has become the fundamental law
of nearly every state in the Union.   It has been well said
that this provision was obviously inserted to prevent the
expenditure of the people's treasure without their consent.
(*State* v. *Burdick*, 4 Wyo. 272, 33 Pac. 125, 24 L. R. A.
266.)   Its purpose is "to secure regularity, punctuality,
and fidelity in the disbursements of the public money."
(3 Story's Commentaries, 1342.)   "All the expenses of the
government being paid by the people, it is the right of
the people, not only not to be taxed without their own con-
sent, or that of their representatives freely chosen, but also
be actually consulted upon the disposing of the money.
Such a provision forms a salutary check, not only upon the
extravagance and profusion in which the executive depart-
ment might indulge itself, but also against any misappropri-
ation which a rapacious, ambitious, or otherwise unfaithful
executive might be disposed to make.   In those governments
where the people are taxed by the executive no such check
can be interposed.   The prince levies whatever sum he thinks
proper, and would deem it sedition against him and his
government if any account were required of him and in what
manner he had disposed of any part of them.   Such is the
difference between government where there is responsibility
and where there is none." (Tucker's Commentaries; *Thomas*
v. *Owens*, 4 Md. 225.)   This inhibition for keeping the expend-
iture of the public moneys more nearly in control of the
people may be compared with the one requiring all bills for
revenue in parliament to originate in the house of commons,
and in congress in the house of representatives.   Under our

advanced, protective system, no officer or individual has control of the public moneys. The provision that no moneys shall be drawn from the treasury but in consequence of appropriations made by law requires that their expenditure shall first be authorized by the legislature, which stands as the representative of the people. No particular words are essential so long as the will of the lawmaking body is apparent. It has been held in a number of decisions that the word "appropriate" is not indispensable. It is not necessary that all expenditures be authorized by the general appropriation bill. The language in any act which shows that the legislature intended to authorize the expenditure, and which fixes the amount and indicates the fund, is sufficient. It is customary to create a legislative fund at the beginning of the session, and separate acts appropriating money are usual at every session.

It is provided by an act approved March 8, 1879 (Stats. 1879, p. 108, c. 102), entitled "An act authorizing the payment of salaries of officers fixed by law":

Section 1: "All state officers whose salaries are fixed by law shall be entitled, from and after the passage of this act, to receive same on the first of each calendar month; *provided,* that nothing in this act shall be construed to mean the payment of salaries in advance." (Comp. Laws, 2088.)

Sec. 2: "The controller is hereby authorized and directed to draw his warrant, and the state treasurer to pay same, in accordance with the first section of this act." (Comp. Laws, 2089.)

By an examination of numerous acts providing for the compensation of our state officers, it will be found that generally no fund is specified for the payment of their salaries.

By an act approved January 16, 1865 (Stats. 1864–65, p. 97, c. 11), directly after the admission of Nevada into the Union, entitled "An act in relation to the compensation of members of the legislature and state officers," per diem and mileage were provided for members of the legislature in section 1.

Section 2 reads: "The governor shall receive an annual compensation of four thousand dollars; the secretary of

state, treasurer, and controller, an annual compensation of three thousand six hundred dollars each; the attorney-general, an annual compensation of two thousand five hundred dollars; * * * The compensation of the respective state officers, as provided herein, shall be payable quarterly.

"Sec. 3. The controller is hereby authorized and required to draw his warrants upon the state treasurer, in favor of the members of the senate and assembly, upon presentation of certificates of compensation due, signed by the sergeants-at-arms and the presiding officers of the two houses respectively, for the amounts named therein. He shall, on the first judicial day of the months of January, April, July, and October, draw his warrants in favor of the several state officers for the quarterly compensation due them by virtue of the provisions of section two of this act."

The act nowhere mentions any fund from which the salaries were to be paid.

The act approved March 3, 1866 (Stats. 1866, p. 205, c. 104), changed the compensation of the governor and of the lieutenant-governor, and provided that the salary of the latter should be $3,000, payable monthly, as compensation as warden of the state prison. No fund was specified.

"An act regulating and reducing the salaries and compensation of certain state officers and attachés of the state government of Nevada," approved February 21, 1881 (Stats. 1881, p. 43, c. 32), provided for the payment of reduced salaries to various state officers without mentioning any fund except for the compensation of the surveyor-general and superintendent of public instruction, which was directed to be paid out of the state school fund.

The same is true of the act approved March 21, 1891 (Stats. 1891, p. 104, c. 90), making further reductions in the salaries of some of the state officers, and under which the governor, secretary of state, controller, treasurer, attorney-general, and surveyor-general are now being paid.

The general appropriation act of the last legislature (Stats. 1907, p. 222, c. 113), under which the state government is at present being maintained, and which is very similar to former general appropriation bills, begins with this language: "The

following sums of money are hereby appropriated for the purposes hereinafter expressed and for the support of the government of the State of Nevada for the years 1907 and 1908:

"Sec. 2.    For the salary of the governor, eight thousand dollars."

Then follows a list of over eighty other amounts for salaries and sums appropriated for other purposes, and no fund is specified from which these are to be paid, excepting in six instances, five of which provide that the salaries of the surveyor-general and the state superintendent of public instruction and certain expenses in their offices shall be paid out of the state school fund, and one appropriating $85,000 for the support of the university, different parts of which amount are directed to be paid from the interest from the ninety-thousand-acre grant, from the contingent university fund, and from the general fund, respectively.

It would seem that warrants have generally been drawn and paid and the state government conducted from its inception on the theory that, when no fund was specified from which money appropriated by the legislature was to be paid for the state's ordinary expenses, the general fund was implied and understood. The salaries of the other state officers are being, and have been, paid under acts which not only do not specify any fund, but which do not direct their payment to be made out of the state treasury, as section 3, first above quoted, does for the petitioner.

In *People* v. *Goodykoontz*, 22 Colo. 509, 45 Pac. 415, the court said: "Two questions are presented by this record: First—Is the boiler inspector an officer of one of the departments of the state, and, as such, has he a preferred claim against the state for his salary? Second—Did the legislature make such an appropriation to pay relator's salary as made it incumbent upon the auditor to issue warrants therefor? * * * In the case of *Goodykoontz* v. *Acker*, 19 Colo. 360, 35 Pac. 911, it was urged that, when the salary of a public officer is fixed by law, together with the time and method of payment, this constitutes an appropriation within the terms of our constitution and statutes. In response to this argument, the court said: 'Although the

decisions are not uniform, it must be admitted that the trend of the more recent cases is in support of this argument.' * * * There is no intention to make the salary of the inspector subject to further legislation to be inferred from anything expressed in the act. It reads: 'Said inspector shall receive an annual salary of two thousand five hundred (2,500) dollars and mileage at ten cents per mile, payable the same as other officers of the state.' And by other acts then and now in force, other state officers are paid in monthly installments at the end of each and every month; the auditor being required upon request to draw warrants upon the state treasurer for such salaries. Nothing is left indefinite and uncertain under these provisions. * * * The object of the constitutional provision inhibiting the payment of money from the state treasury, except by an appropriation made by law, is to prohibit expenditures of the public funds at the mere will and caprice of the crown or those having the funds in custody, without direct legislative sanction therefor; but no such evil need be feared, where, as in this case, the salary of the officer is fixed, together with the time and method of his payment. And we conclude that the act creating the office of state boiler inspector and fixing his salary, when considered in connection with other statutes, designating the time, mode, and manner of payment, constitutes a continuous appropriation for such salary, and that no further legislative sanction is necessary to authorize the proper officers to pay the same. This conclusion is in accordance with several opinions given by the attorneys-general of this state to the auditor at different times, and upon which opinions the salaries of several of the state officers have in the past been paid. (See Report of Attorney-General of Colorado, years 1889 and 1890, pp. 60 and 98; 1891 and 1892, p. 23.) So, likewise, the attorney-general of the State of Indiana has decided the same question in the same way. (See Report and Opinions of Attorney-General of Indiana for 1888, p. 155.) This last opinion was rendered upon this state of facts: The legislature having adjourned without making any appropriations for the salaries of the officers connected with the state government for the year 1888, the

question presented was whether or not such salaries should be paid by the auditor and treasurer without further legislation in the nature of special appropriations therefor. In an exhaustive and able opinion, it is held that it was the duty of the auditor to draw warrants for such salaries, and this conclusion was accepted without being questioned in the courts." See Report of Attorney-General of Nevada, 1903–04, p. 18.

In *State* v. *Grimes*, 7 Wash. 193, 34 Pac. 834, it was said: "But, outside of any light which may be thrown upon the intention of the lawmakers by aid of the title, we are clearly of the opinion that the language employed in the body of the act is amply sufficient to show that the intention of the legislature was to appropriate. They have designated the amount, and have directed that it be paid out of any moneys in the state treasury not otherwise appropriated. This, we think, is sufficient, and the appropriation contemplated by the constitution is as plainly indicated as though the formal words 'there is hereby appropriated' were used. No arbitrary form of expression is dictated by the constitution, and none should be required. Many cases have been adjudicated in states having substantially the same constitutional provision as the one in question, and so far as we have been able to ascertain they have uniformly been determined in favor of the relator's contention. See *State of Louisiana* v. *Bordelon*, 6 La. Ann. 68; *Humbert* v. *Dunn*, 84 Cal. 59, 24 Pac. 111, and cases cited."

In *Reynolds* v. *Taylor*, 43 Ala. 427, the petitioner was entitled to a salary of $2,000 as marshal and ex officio librarian, and the legislature had made provision for payment of only $1,000 in the general appropriation bill. The court said: "It is insisted that the application of appellee should be denied, because it is not shown that an appropriation had been made to pay his salary, as marshal, at the sum claimed by him; but that appropriations had been made to pay him $1,000 salary per annum only, and not $2,000, as claimed. We know that the general appropriation acts of 1866 and 1867 appropriated $1,000 only for the payment of the salary of the marshal of the supreme court. This objection is sufficiently answered, by a decision of this court,

made more than thirty years ago. In the case of *Nichols* v. *Controller*, 4 Stew. & P. (Ala.) 154, it is decided that, in order to authorize the controller to issue his warrant on the treasury, for the amount of a salary, it is not necessary that there should be a special annual appropriation by act of the legislature, where there is a general law fixing the amount of the salary, and prescribing its payment at particular periods."

*Proll* v. *Dunn*, 80 Cal. 220, 22 Pac. 143: "There is no provision in the constitution providing or prescribing any particular form of words in which an appropriation shall be made, except that it shall be made by law. * * * It is claimed that the act does not specify upon what fund the warrant is to be drawn; and, as the controller is required in every warrant to specify the fund out of which it is payable, therefore that it is insufficient. Several authorities are cited which are claimed to support the proposition that the act itself must specify the fund out of which the money is to be drawn, but we do not think they bear that construction, in the sense in which it is claimed for it here, and, as to the statutes, not one appropriation act in fifty designates the fund out of which the money is to be drawn. The majority of all appropriations are drawn out of a single fund, and that without any designation in the act as to what fund the money shall be drawn from. * * * Neither the constitution nor the code requires that an appropriation act shall specify the fund out of which the appropriation shall be paid, nor is it usual in appropriation acts to do so. If such a specification is required, the wheels of the government ought long since to have stopped, for out of many acts which we have examined, including the general appropriation bills for the current and past years, we find none which make such designation. It has become and is the custom in this state, of very general, but not universal, application, to use the phrase 'appropriated out of any money in the treasury not otherwise appropriated.' But it seems to be mere custom, not founded upon any constitutional or other legislative requirement. And we learn from the argument that the controller interprets that phrase to mean 'out of the general fund.' We

know of no law which authorizes such an interpretation.  On the contrary, it would seem that everything authorized by law to be paid out of the state treasury is payable out of the general fund, if not specially made payable out of some specific fund.  * * *  The amount named for the general fund is supposed to be sufficient to meet the aggregate of all the appropriations made for the year except such as have been expressly made payable out of some special fund.  * * *  Appropriations are made, and can only be made, by the legislature.  The constitution has prescribed no set form of words in which it is to be done.  All that is required is a clear expression of the legislative will on the subject.  * * *  But, says the controller, it has not designated the fund out of which the appropriation is payable.  It did not in any of the former years; nor has it designated the fund out of which the salaries of any of the officers of the state, or the expenses of any of the other bureaus or departments of the government, shall be paid.  'It has not said that the money is appropriated out of any moneys in the treasury not otherwise appropriated.'  What of it?  The legislature can make no appropriation 'except out of the treasury.'  The remaining words are not only a form not required by law, but usually a fiction, for at the time of the passage of appropriation bills there is not usually any money in the treasury in excess of existing appropriations, and whenever the legislature makes a new appropriation, it is to be assumed that it will provide funds to meet the same.  As said by Chief Justice Field, in *McCauley* v. *Brooks*, 16 Cal. 11: 'Appropriations are made in anticipation of the receipt of the yearly revenues.'  'An appropriation is the act of setting apart, or assigning to a particular use or person, in exclusion of all others; application to a special use or purpose, as of * * * money to carry out some public object.'  (Webster's Dict.)  'An appropriation of the money to a specific object would be an authority to the proper officers to pay the money, because the auditor is authorized to draw his warrant upon an appropriation, and the treasurer is authorized to pay such warrant if he has appropriated money in the treasury.'  (*Ristine* v.

*State,* 20 Ind. 339.) In this act we have a clear, distinct expression of the legislative will making the appropriation. The words 'out of any moneys in the treasury not otherwise appropriated' are not necessary to the expression of that will, or the making of such appropriation. They are in common use in this state, but nowhere made necessary, and are not always used."

*Humbert* v. *Dunn,* 84 Cal. 57, 24 Pac. 111: "The question is whether these provisions of the act constitute an 'appropriation' within the meaning of that term as used in section 22, article IV of the constitution, which provides that 'no money shall be drawn from the treasury but in consequence of appropriations made by law.' It is true, the usual formula, 'there is hereby appropriated the sum of ......... dollars out of any money in the state treasury not otherwise appropriated, for the payment of salaries,' is not found in the act, but the intention of the legislature to provide for the payment of the salaries of the commissioners as they accrued is clearly manifested in the language used: 'Each member * * * shall receive a salary of two thousand four hundred dollars per annum, payable monthly'—and it is 'to be paid out of any money in the state treasury not otherwise appropriated.' There is nothing in this language indicating an intention to postpone the payment of the salaries of the commissioners until the next session of the legislature. They are to be paid monthly, and out of any money not otherwise appropriated. 'Not otherwise appropriated' when? Clearly at the time when the services are performed and the monthly payments become due. While it is customary to use the words 'there is hereby appropriated the sum,' in bills appropriating money for the payment of salary and other expenses of the government, it is not essential to the validity of an appropriation that those words or any of them, should be used, if the legislature has clearly designated the amount and the fund out of which it is to be paid. * * * It is claimed that the act is unconstitutional because it does not specify the amount to be appropriated; that the amount which may be incurred as expenses is uncertain. So far as the traveling expenses are concerned, this contention may be good. We are not called upon to

decide this question, however, as the only claim here is for salary, which is fixed by the act at $2,400 per annum, payable monthly. The act provides for the appointment of three engineers as commissioners, and so far as their salaries are concerned the amount appropriated is fixed and certain."

*Campbell* v. *Board*, 115 Ind. 594, 18 N. E. 33: "It is true, as claimed, that no money can be rightfully drawn from the treasury except in pursuance of an appropriation made by law; but such an appropriation may be made impliedly, as well as expressly, and in general, as well as specific, terms. It may also be a continuing or fixed appropriation, as well as one for a temporary purpose or a limited period. The use of technical words in a statute making an appropriation is not necessary. There may be an appropriation of public moneys to a given purpose without in any manner designating the act as an appropriation. It may be said, generally, that a direction to the proper officer, or officers, to pay money out of the treasury on a given claim, or class of claims, or for a given object, may, by implication, be held to be an appropriation of a sufficient amount of money to make the required payments. (*Ristine* v. *State ex rel.*, 20 Ind. 328.)"

In *Carr* v. *State*, 127 Ind. 204, 26 N. E. 778, 11 L. R. A. 370, 22 Am. St. Rep. 625, and in *State* v. *Burdick*, 4 Wyo. 272, 33 Pac. 125, 24 L. R. A. 266, it was held that, if the salary of a public officer is fixed and the time of payment prescribed by law, no special appropriation is necessary to authorize the issuing of a warrant for its payment. Other cases supporting the above and the views expressed are cited in the brief, and in a note beginning at page 638, 22 Am. St. Rep., and in *State* v. *Burdick*, *supra*.

In *State* v. *Westerfield*, 23 Nev. 473, 49 Pac. 121, an item in the general appropriation bill read: "For salary of one teacher and one assistant teacher at the state orphans' home, two thousand four hundred dollars, payable out of the general school fund." The court held that the general school moneys could not be applied to the orphans' home, and treated the words "payable out of the general school fund" as unconstitutional, null, and void, and the appropriation as if they

had been omitted. It was said in the decision: "We hold that the legislature has made a valid appropriation for the payment of the salary in question, and that the same is payable out of the general fund in the state treasury the same as the salary of the governor and most of the other state officers, and the same as other appropriations in which no specific fund is named. * * * It will be observed that it is not required that the fund out of which the appropriations are to be made shall be named in the appropriation act."

The petitioner's claim for traveling expenses is viewed in a different light from his demand for salary. By a perusal of the language in this regard in section 3, it will be observed that not only no fund is specified, but there is no language directing payment out of the state treasury such as is contained in the provision for the salary. Section 6 of the act directs that the commission shall have the right to solicit and receive private contributions, but shall accept no money or other considerations from any firm or individual in payment of specific services or favors rendered. Section 8 provides that there may be allowed to such commission by the commissioners of the several counties a sum not exceeding in amount $250 per year from each county in the state to be used by the commission for the purpose for which it is established and for the best interests of the various counties and the state. There are no words in the entire act stating that the traveling expenses shall be paid from moneys donated by individuals or collected from the counties, or from the state treasury. It is not necessary to determine whether there is any implication in regard to a fund or moneys from which these expenses might be paid, for the fatal objection to their payment is the fact that no maximum or other amount is specified in connection with them at any place in the act. (*Ingram* v. *Colgan*, 106 Cal. 118, 38 Pac. 315, 39 Pac. 437, 28 L. R. A. 187, 46 Am. St. Rep. 221; *Institute* v. *Henderson*, 18 Colo. 105, 31 Pac. 714, 18 L. R. A. 308.)

As all appropriations must be within the legislative will, it is essential to have the amount of the appropriation, or the maximum sum from which the expenses could be paid,

stated. This legislative power cannot be delegated nor left to the recipient to command from the state treasury sums to any unlimited amount for which he might file claims. True, the exact amount of these expenses cannot be ascertained nor fixed by the legislature when they have not yet been incurred, but it is usual and necessary to fix a maximum either in the general appropriation bill or in the act authorizing them, specifying the amount above which they cannot be allowed.

*State* v. *LaGrave*, 23 Nev. 25, 41 Pac. 1075, 62 Am. St. Rep. 764, stripped of dicta, is applicable to the question here relating to the traveling expenses, but may be distinguished as not bearing on the one involved pertaining to the salary. There it was said that, under the existing facts, it was improbable that the provisions of the statute were intended as an appropriation because the number of military companies that could have received its benefits was indefinite and uncertain. The act named an amount for each company. The number of companies which might take advantage of its provisions was uncertain, as was also the aggregate of the sums which might be drawn from the treasury. The act did not specify any maximum within which the allowances were to be confined, and no provision was made in the general appropriation bill. Hence the total money which might be drawn from the state treasury was not specific, but was not as uncertain as it is here.

The language in section 3 that "the members of the commission shall be allowed actual expenses of travel incurred in traveling upon the official business of the commission" is not accompanied by any limitation of the travel to this state or elsewhere, and is broad enough, if enforced, without any maximum amount being named by the legislature, to allow the members of the commission to travel around the world *ad libitum* on the business of the commission at the expense of the state. This indefiniteness does not exist in regard to the salary, which has been fixed by the legislature, and which is certain as to the amount and as to the person to whom, and the time when, it is to be paid.

As section 3 of the act creating the commission states that

"the chairman shall receive as compensation for his services to be paid out of the state treasury the sum of two thousand five hundred dollars per annum, payable in equal monthly installments upon the first day of each and every month," and the act of March 8, 1879, that all officers whose salaries are fixed by law shall be entitled to receive the same on the first day of each calendar month, and that the state controller is authorized and directed to draw his warrant and the state treasurer to pay the same, it is clear that petitioner is entitled to his salary. No other construction would be in harmony with the plain meaning and directions of these sections. As the legislature has named the amount of the salary and directed the issuance of warrants and its payment monthly out of the state treasury, any additional act providing for the accomplishment of these purposes which are already shown to have been intended is not required and would be an unnecessary repetition.

Section 6 of "An act relating to the duties of the state controller," approved February 24, 1866 (Stats. 1866, p. 97, c. 43), directs that no warrant shall be drawn on the treasurer except there be an unexhausted, specific appropriation by law to meet the same. It is not contended that the fund is exhausted. It is evident that there is an appropriation by law for the salary of the chairman of the commission because the amount and time and manner of payment are specific and certain, but not so in regard to the traveling expenses. If the section relating to the duties of the controller is in conflict, which is not apparent, it would be controlled by the later acts fixing the salary of the petitioner as a state officer and directing the controller to draw his warrants in favor of state officers for their salaries on the first of each month.

Submission of the case was made upon demurrer as upon the merits.

It is directed that a writ of mandate issue commanding the defendant, as state controller, to draw his warrant upon the state treasurer in favor of the plaintiff for the salary claimed, but not for the traveling expenses.