132    SUPREME COURT OF WISCONSIN.    [FEB.

State ex rel. Board of Regents v. Zimmerman, 183 Wis. 132.

STATE EX REL. BOARD OF REGENTS OF NORMAL SCHOOLS, Plaintiff, vs. ZIMMERMAN, Secretary of State, Defendant.

*February 16—February 29, 1924.*

*States: Expenditure of public moneys by legislature: Method: Control by courts: Failure to limit expenditure: Appropriation operative on happening of future event: General deficiency statute: Statutes: Construction: Constitutionality: Acquiescence for many years: "Emergency" appropriation: Public officers: Board determining facts and issuing certificates: Majority action: Sufficiency: Mandamus to compel payment by disbursing officer.*

1. Legislative bodies may appropriate money wisely or unwisely, too sparingly or too extravagantly; but so long as they keep within the limits of the organic law they are accountable not to the courts but to their constituents alone.    p. 139.
2. The means by which legitimate expenditures are to be made by a legislature necessarily rest largely in legislative discretion; a discretion which the courts have little power or little inclination to control so long as there is no violation of constitutional requirements.    p. 139.
3. Sec. 20.74, Stats., appropriating annually, as an emergency appropriation, such sums as may be necessary to meet operating expenses of any state institution, department, board, commission, or other body for which sufficient money has not been appropriated to properly carry on the ordinary regular work, is not void merely because it prescribes no definite sum, the constitution not requiring appropriations to be specific or definite in amount.    p. 139.
4. While the legislature may not delegate its power to make a law, it may enact a statute to become operative on the happening of a certain contingency or future event.    p. 141.
5. Said sec. 20.74, authorizing such emergency appropriations upon the certification of the governor, secretary of state, and state treasurer that such moneys are needed to carry on the ordinary regular work of a state institution, is not void as delegating the legislative power of appropriation of moneys from the public treasury to the three state officers named. p. 140.
6. The word "emergency" does not so control the meaning of the statute as to prevent the expenditure of money under it to

carry on the ordinary regular work of the institutions referred to.   p. 144.

7. If statutes are obscure or doubtful in meaning they should be so construed, if possible, as to carry out their leading idea and purpose.   p. 146.

8. The controlling idea of said sec. 20.74 was to authorize, on the conditions and contingencies named, the payment of moneys to carry on the ordinary regular work of the state institutions and bodies named therein, without regard to the classification which had been adopted in the state auditing system. p. 146.

9. Generally, where authority is given to three or more persons to perform a public duty the majority may decide; and in view of sub. (3), sec. 4971, Stats., a majority of the "emergency board" may issue the certificate required to authorize an expenditure under sec. 20.74.   p. 147.

10. Acquiescence in the validity of a statute for many years will have weight with a court in determining the validity of a similar statute.   p. 149.

11. Where a disbursing officer refuses to pay a claim presented to him which has been ascertained in amount and which it is his duty to discharge, *mandamus* is generally recognized as the appropriate remedy to compel its payment.   p. 150.

12. Under said sec. 20.74 the certification by a majority of the designated officials determined the sum needed as well as the existence of other facts prescribed by the statute; and the sums to be paid thus being definitely fixed, the duty in respect to their payment was ministerial and not discretionary, so that upon such certification *mandamus* was proper to compel the secretary of state to audit a claim for the sum stated in the certification.   p. 150.

ESCHWEILER, J., dissents.

MANDAMUS to the secretary of state.  *Peremptory writ issued.*

The facts are stated in the opinion.

*M. B. Olbrich* of Madison, special counsel, for the petitioner.

For the defendant there was a brief by *Walter D. Corrigan,* special counsel, and *M. K. Whyte* and *Walter D. Corrigan, Jr.,* of counsel, all of Milwaukee, and oral argument by *Walter D. Corrigan.*

State ex rel. Board of Regents v. Zimmerman, 183 Wis. 132.

The following opinions were filed March 11, 1924:

JONES, J.    This is an action in *mandamus* under the original jurisdiction of the court by the state of Wisconsin, upon the relation of the *Board of Regents of Normal Schools,* to compel *Fred Zimmerman,* secretary of state, to audit a claim of $168 for certain text-books.

The plaintiff relies on the following statute:

"There is annually appropriated such sums as may be necessary, payable from any moneys in the general fund or other available funds not otherwise appropriated, as an emergency appropriation to meet operating expenses of any state institution, department, board, commission or other body for which sufficient money has not been appropriated to properly carry on the ordinary regular work.   No moneys shall be paid out under this appropriation except upon the certification of the governor, secretary of state and state treasurer that such moneys are needed to carry on the ordinary regular work of the institution, department, board, commission or other body for which the moneys are to be used and that no other appropriation is available for that purpose.   Any moneys so required beyond the regular appropriation shall appear on the books of the secretary of state as an additional cost of operating the institution, department, board, commission or other body as the case may be."    Sec. 20.74, Stats.

The petition set forth the authority of the *Board of Regents of the State Normal Schools* to purchase needful apparatus, books, and other articles to assist in instruction, and, subject to the approval of the governor and the state chief engineer, to remodel and repair buildings now existing and useful in the work of carrying on instruction; that the governor, state treasurer, and secretary of state, pursuant to sec. 20.74, Stats., are the State Emergency Board, and under that section, when moneys are needed to carry on the ordinary regular work of the normal schools and no other appropriation is available for that purpose, are authorized, and it is their duty, to certify that fact; that the

secretary of state is auditor of the state of Wisconsin; that on the 19th day of December, 1923, sufficient money had not been appropriated to carry on such ordinary and regular work except by said sec. 20.74, and that at that time moneys were needed to carry on such work for text-books, apparatus, remodeling toilet rooms, support and reinforcement of one of the libraries, ·in all amounting to $31,800; that no appropriation was available for such purposes; that the said sums were presently needed to carry on the ordinary regular work; that on the 9th and 19th days of November, 1923, the facts were duly presented to the Emergency Board by the president and a committee of the *Board of Regents of Normal Schools;* that on the 19th day of December, 1923, the governor and state treasurer made their certification, but that the secretary of state refused and refuses to sign the same; that upon its execution by the governor and state treasurer the said amounts became available for the purposes specified; that relying thereon the *Board of Regents* directed the expenditure of said sums in connection with the operation of the nine normal schools of the state; that afterward the *Board of Regents* caused to be purchased certain necessary text-books needed for carrying on the ordinary regular work of the Whitewater normal school, and pursuant to law a sworn voucher for the purchase price in the sum of $168, duly certified as required by law, was presented to the secretary of state for audit; that notwithstanding his plain duty he declined and refused to audit and allow the same on the grounds that no appropriation for its payment was available under sec. 20.74, Stats., and unless ordered by the court he will continue to so refuse.

It was alleged on information and belief that the secretary of state threatens to refuse to allow all other similar claims; that the effect of such refusal will be to greatly hamper, cripple, and prevent the discharge of the ordinary regular work of said schools; and that it will become necessary for several of them to close their doors and discontinue their courses of instruction.

The petition prayed that he be directed to audit said claim and execute said certification, or show cause to the contrary. The certificate signed by the governor and state treasurer was attached as an exhibit.

The alternative writ was issued as prayed and the defendant made his return. The substance is stated in the brief of his counsel as follows:

"The defendant avers as his reasons for refusing and still refusing to audit and to sign and certify, and as reasons why he should not be compelled to audit or sign and certify, that the act in question is unconstitutional; that no emergency existed or exists; that the items referred to in the writ are not operating expenses; that the 1923 legislature refused to make an appropriation for any of the purposes enumerated; that the three state officers referred to have no power, authority, or right to make an appropriation where the legislature has refused to make one; that he has exercised a discretion not to certify; that he is of the opinion that the moneys are not needed for operating expenses; that the money if needed should be appropriated by the legislature; and because of the appropriations for operation made by sec. 20.38. The return denies that it will become necessary for the schools to close or discontinue their courses."

Although the item which the secretary of state refused to audit amounted to only $168, the issue involved is much broader than this amount or than the $31,800 involved in the certification.

It is argued by counsel for defendant that the statute in question is unconstitutional because it prescribes no definite sum, fixes no maximum, and provides no measure by which the amount can be ascertained. It is said that the statute endeavors to make available the entire treasury of the state not otherwise specifically appropriated, and, if construed as plaintiff contends, it is almost unlimited as to the purposes for which the treasury can be used.

It is claimed that to constitute an appropriation a definite sum must be set aside for a definite purpose. As sustaining

their objection counsel cite the following cases: *State ex rel. Davis v. Eggers,* 29 Nev. 469, 91 Pac. 819; *Ingram v. Colgan,* 106 Cal. 113, 38 Pac. 315, 39 Pac. 437; *State ex rel. McDonald v. Holmes,* 19 N. Dak. 286, 123 N. W. 884; *Hughes v. Reeves,* 45 S. Dak. 538, 189 N. W. 307; *Ristine v. State ex rel. Board of Comm'rs,* 20 Ind. 328; *Fergus v. Russel,* 270 Ill. 304, 110 N. E. 130; *Menefee v. Askew,* 25 Okla. 623, 107 Pac. 159; *Jobe v. Caldwell,* 93 Ark. 503, 125 S. W. 423; *Dickinson v. Clibourn,* 125 Ark. 101, 187 S. W. 909.

Some of these decisions undoubtedly give support to the view that, as all appropriations must be within the legislative will, it is essential to have the amount or the maximum sum from which the expenditures are to be paid, stated, and that in the absence of an ascertainable limit to the amount of money which may be devoted to the object contemplated no appropriation is made.

In the states of North Dakota, Arkansas, Oklahoma, and South Dakota there are constitutional provisions that appropriations must be specific, or there are other provisions imposing conditions not found in our constitution. In the Indiana case above cited there was a vigorous decision sustaining the view of defendant's counsel; but it seems difficult to reconcile with this decision some of the later cases. *Henderson v. Board of Comm'rs,* 129 Ind. 101, 28 N. E. 127; *Hart v. State* (Ind.) 64 N. E. 854. The same may be said of the decisions in California.

Counsel for plaintiff rely on the following cases as supporting the view that an appropriation is not invalid because no maximum is stated: *Prime v. McCarthy,* 92 Iowa, 569, 61 N. W. 220; *State ex rel. Bonsteel v. Allen,* 83 Fla. 214, 91 South. 104; *Holmes v. Olcott,* 96 Oreg. 33, 189 Pac. 202; *State ex rel. Peel v. Clausen,* 94 Wash. 166, 162 Pac. 1; *State ex rel. Turner v. Henderson,* 199 Ala. 244, 74 South. 344.

It is the effect of these decisions that appropriations may be legally made for purposes authorized by law although indefinite in amount, which appropriations provide that expenditures may be made as the occasion may require, under the direction of designated officers of the state under specified conditions.

The statute now under consideration is no innovation in the legislative history of the state. From its earliest history appropriations of the same character have been made without attack in the courts, although three governors have questioned the policy of the statute now under consideration. Nearly seventy years ago statutes were enacted authorizing state officers to employ such clerks as they considered necessary and to fix their salaries. At a very early date there were unlimited appropriations for employment and supplies necessary to carry on the necessary work of departments, and later there were such appropriations for the payment of all salaries and other disbursements authorized by law for which no other appropriation was made.

In 1863 a statute directed the secretary of state to audit and the state treasurer to pay "all reasonable expenses incurred by the militia in the actual service of the state and all other claims required under the provisions of this act." In 1849 a statute made a continuing and unlimited appropriation to the governor to employ special counsel when he considered it necessary in the public interest, leaving the compensation to be paid entirely in his discretion. With some modification the statute still exists.

Counsel for the State has collected in the appendix of his brief a very large number of statutes of this character, of which only a few are here mentioned.

It also appears that the same mode of making appropriations was adopted by Congress early in its history and has continued to the present time under a constitutional provision similar to our own. It is well known that in many of

our sister states appropriations are often made indefinite in amount.

The only decision of this court bearing on the subject, cited by either counsel, is *Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 108 N. W. 557, in which the court said:

"The only limitations are, it cannot exercise the power of taxation for any but public purposes, and having exercised such power it can only devote the money accumulated thereby to public purposes, and by some reasonably proper way of appropriating the same, so that legislative action can be referred to as authorizing payment of the money out of the public treasury. . . .

"Probably the annual budget method is the most business-like way, both with reference to the amount to be raised by taxation and the division thereof to the particular public purposes. But the constitution leaves the way open for the legislature to exercise the widest discretion in that matter." Pages 633, 634.

So long as the legislature keeps within the limits of the state and federal constitutions and the treaties of the land its power to appropriate public money is almost unbounded. Legislative bodies may appropriate money wisely or unwisely, too sparingly or too extravagantly, but so long as they keep within the limits of the organic law they are accountable not to the courts but to their constituents alone.

As to the form which appropriations may take, the constitution lays down no ironclad rules. There is no such requirement that appropriations shall be specific or definite in amount as is found in the constitution of some of our sister states.

In two lines it is declared that no money shall be paid out of the treasury except in pursuance of an appropriation by law. We do not consider that it is within the province of the court to annex restrictions or limitations to this plain language, or to prescribe the form of appropriation bills. The means by which legitimate expenditures are to be made

necessarily rest largely in legislative discretion, a discretion which the courts have little power or little inclination to control so long as there is no violation of constitutional requirements.

It is next contended by counsel for defendant that the statute in question is an invalid attempt to delegate the legislative power of appropriation; that it practically surrenders to three state officers the power of appropriating money from the public treasury.

It is argued that there was no necessity for the enactment of the statute since it has always been the practice for the legislature to appropriate such sums as were necessary for conducting the educational institutions of the state, and no change had taken place making it necessary for the legislature to delegate its power.

Counsel distinguish this legislation from that which deals with a situation where there is a multitude of detail of an administrative character which may be left to such bodies as the industrial commission and the railroad commission.

There is perfect agreement as to the general rule that the lawmaking power of the state rests exclusively with the legislature and that this function cannot be abdicated or surrendered, although, as our constitution so provides, the legislature may confer certain powers of a local legislative and administrative character upon county boards and municipal corporations.

The difficulty arises in each case in determining whether the statute in question attempts to confer upon officers or boards the power to legislate or whether it confers powers administrative in their nature.

In the present case, in our opinion, no attempt was made to confer legislative powers upon the three state officers designated by the statute. The appropriation, although indefinite in amount, was complete when the bill became a law, although no expenditures under the appropriation were

to be made until certain facts were to be certified by the public officers named in the bill.

There is no such novelty in this legislation as seems to be assumed by counsel for the defendant. It is well settled that while the legislature may not delegate its power to make a law it may enact a statute to become operative on the happening of a certain contingency or future event, and such statutes are very common. It was said in a Pennsylvania case that "half the statutes on our books are in the alternative, depending upon the discretion of some person or persons, to whom is confided the duty of determining whether the occasion exists for executing them. But it cannot be said that the exercise of such discretion is the making of the law." *Moers v. Reading,* 21 Pa. St. 188, 202.

This may be an overstatement as applied to legislation in this state, but it requires no protracted examination of appropriation statutes to find that such statutes are often enacted both by the Wisconsin legislature and Congress. The present statute differs from many others previously passed by the legislature without challenge, not in principle, but only because greater amounts may be expended under its provisions.

Counsel for plaintiff has cited a large number of statutes of this kind, dating from 1861, in which appropriations were made to become available upon the subsequent approval of the governor or the governor and other officers. Under some of these statutes expenditures for very considerable amounts were made.

Such statutes are wholly unlike that referred to in the brief of counsel for defendant where the attempt was made to delegate to a group of freeholders the legislative power to levy a tax in their individual capacity. *State ex rel. Carey v. Ballard,* 158 Wis. 251, 148 N. W. 1090. They are unlike the statute discussed in *State ex rel. Adams v.*

*Burdge,* 95 Wis. 390, 70 N. W. 347, which attempted to give to the state board of health the power to make such regulations "as may in its judgment be necessary for the protection of the people," and giving it the power to designate what diseases "are contagious or dangerous to the public health."

The following are some of the authorities cited by counsel for plaintiff to sustain his contention: *State ex rel. Atwood v. Johnson,* 170 Wis. 218, 175 N. W. 589; *State ex rel. Milwaukee Med. College v. Chittenden,* 127 Wis. 468, 107 N. W. 500; *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 136 Wis. 146, 116 N. W. 905; *State ex rel. M., St. P. & S. S. M. R. Co. v. Railroad Comm.* 137 Wis. 80, 117 N. W. 846; *Chippewa & F. Imp. Co. v. Railroad Comm.* 164 Wis. 105, 159 N. W. 739; *State v. Lange C. Co.* 164 Wis. 228, 157 N. W. 777, 160 N. W. 57; *State ex rel. Owen v. Stevenson,* 164 Wis. 569, 161 N. W. 1; *State ex rel. Smith v. Outagamie Co.* 175 Wis. 253, 185 N. W. 184; *State ex rel. Buell v. Frear,* 146 Wis. 291, 131 N. W. 832.

It is argued by counsel for defendant that a holding that this statute is not a delegation of legislative power would be tantamount to a ruling that the legislature may abdicate its power of control over the expenditure of public moneys and the surrender of such control to a few officials, and the danger of such a system is vividly described.

The fact that for so many years statutes have been enacted of the same general character as sec. 20.74 without challenge in the courts would seem to indicate that the danger is not so serious as counsel anticipate. There are safeguards attached to the statute which must not be overlooked. The appropriation is for public, not private purposes. It is for the purpose of carrying on the ordinary regular work of the state institutions or other bodies named in the statute. The moneys can be paid out only on the certification of the high officials named that the moneys are

needed to carry on such work and that no other appropriation is available for that purpose. Doubtless if the officers named in the act should approve a demand calling for expenditures wholly unauthorized, a taxpayer could by injunction prevent its audit and payment.

In such a government as ours there is always abundant criticism of the way in which public affairs are administered. But we hear little complaint that legislative bodies and courts abdicate their powers. On the contrary it is a quite general complaint that they seek to amplify their powers and extend their jurisdiction beyond constitutional limitations.

Another claim made by counsel for defendant is that even if the statute in question is constitutional it is not applicable to the present situation because the power conferred can be exercised only in the case of an emergency, and that no emergency exists; that in order to call into exercise the action of the officers designated in the act there must be some sudden or unexpected occurrence or occasion calling for immediate action; something which the legislature could not have foreseen.

It is argued and seems to be conceded by both counsel that in the legislative session of 1923 serious differences arose between the executive and the legislature with respect to distribution of the burdens of taxation, and that in some way by reason of these differences the usual specific appropriations for the normal schools and the state university fell by the wayside.

It is argued by counsel for defendant that the representatives of the people believed that there was less necessity for an appropriation of money with which to run the schools than there was for a redistribution of the burdens of taxation. It is undoubtedly true that the situation was well understood by members of the legislature when they failed to make the usual specific appropriation. But we cannot impute to the legislature any expectation that the

normal schools of the state and the state university would be left without funds for their regular work. These institutions had been so fondly cherished by the people of the state and so liberally supported by succeeding legislatures for many years that it seems incredible that the legislature intended that their great work should cease.

In our opinion there is a far more satisfactory explanation of the policy which was pursued. There had been much public discussion of the large powers granted to the so-called Emergency Board by sec. 20.74, Stats., and large sums had been expended pursuant to its provisions. It seems to us far more reasonable to believe that the legislature understood that the funds necessary for the ordinary regular work of these institutions would be made available under sec. 20.74 than that the work should be abandoned or seriously crippled. This view is also in accord with the letter and spirit of the constitution, which declares that "provision shall be made by law for the establishment of a state university." Following this mandate the university had been established and generously maintained for many years. It seems to us inconceivable that the legislature of 1923 intended to disregard the constitutional command.

The word "emergency" as applied to appropriation is a descriptive term about the meaning of which there might be infinite discussion. Likewise there might be much discussion of the question whether the leaving of the great institutions of learning of the state without any adequate support was an emergency within the meaning of the statute. Hitherto the state officers have not given any such restricted meaning to the statute as is now claimed, and we do not think the word "emergency" so far dominates and controls the meaning of the statute as to prevent the expenditure of money under it to carry on the ordinary regular work of the institutions referred to.

Counsel for defendant make the proposition that the term "operating expenses" in 1913 gained a definite meaning in

this state; that then a new auditing system was adopted and put in practice under which state expenditures for the different state institutions were classified as "capital outlay," "operating expense," and "maintenance expense," and that this classification has become universal in the state departments; that it was well known to state officers and the legislature, and had been adopted by the *Board of Regents,* and was used designedly by the legislature.

Although this proposition is made it is not discussed in the brief. Doubtless it is inferred by counsel that this classification and custom prevent the expenditure of funds under the statute for capital or maintenance expenses. The subject is quite fully discussed in the brief of counsel for plaintiff, in which numerous statutes are analyzed.

It is hardly necessary to discuss these statutes, but it suffices to say that the system had long prevailed by which appropriations were made for the benefit of departments of state which provided for making expenditures on the approval or in the discretion of designated state officers.

One statute authorized the board in control of the charitable and penal institutions to incur indebtedness in cases of accident or emergency, or when any appropriation made for current expenses was insufficient, on the consent of the governor, secretary of state, and attorney general. This was of course a questionable mode of legislation in view of sec. 6, art. VIII, of the constitution.

It seems that in sec. 20.74 the legislature sought to codify existing statutes on the subject and on a basis more conformable to law to provide for all activities of the state as former statutes had provided for the charitable and penal institutions of the state. It provided that on the contingencies named expenditures should not be made in the discretion of the several departments but on the finding of disinterested parties, officers of the state, that the necessity existed.

As already stated, the statute has several times been the

subject of criticism by the executive, but the legislature has not seen fit to repeal it, and it must be conceded that on several occasions, in the absence of needed special appropriations, it has served a very useful purpose.

During most of the time since 1915, the governor, secretary of state, and state treasurer seem to have construed sec. 20.74 as not confined to operating expenses in the technical meaning of the term, but as broad enough to include expenditures necessary to carry on the ordinary regular work of the bodies named in the act. So construing the act, the Emergency Board has authorized expenditures for new construction and for the purchase of material for maintenance and repairs.

It is a familiar rule in the construction of statutes that if they are obscure or doubtful in meaning they should be so construed if possible as to carry out their leading idea and purpose. We might give to the words "operating expenses" the technical meaning claimed for them, but it does not follow that these words would overrule the obvious meaning of other important language used in the statute.

As we construe the statute it was the controlling idea to authorize, on the conditions and contingencies named, the payment of moneys to carry on the ordinary regular work of the institutions and bodies therein named without regard to the classification which had been adopted in the auditing system.

It is objected that the certification by the governor and state treasurer was not a sufficient compliance with the statute, but that the signature of each of the three officers was necessary. In support of this contention attention is called to the fact that in the governor's message urging the passage of the statute he spoke of unusual emergencies and of the scrutiny which would be exercised by the *Board of Regents,* the state board of education, and finally by the governor, secretary of state, and state treasurer.

It is urged that the three officers designated in the statute

State ex rel. Board of Regents v. Zimmerman, 183 Wis. 132.

were presumed to have special fitness to judge whether proposed expenditures should be made and that the action of each was required as a precautionary measure against a dangerous policy. It is pointed out that in another section of the same chapter it was provided that the same officers, "or a majority of them," might apply the surplus in the treasury or a portion of it as a part of the state levy, and the inference is drawn that the statute in question has the same intent and meaning.

Counsel for defendant cite and quote from only one decision; a decision by the supreme court of Arkansas, where the constitutional provision that all contracts of a certain kind "shall be subject to the approval of the governor, auditor, and treasurer." The treasurer did not approve the contract, and it was held that the approval of each was necessary; that it was in the nature of a veto power, and each officer could withhold his approval and thus veto the contract. *Ellison v. Oliver*, 147 Ark. 252, 227 S. W. 586. The reasons are given for this holding and they are not without force.

But we are of the opinion that according to the great weight of authority the certification by a majority satisfied the terms of the statute. It is somewhat significant that in the very able brief of counsel for defendant only one decision is cited to sustain his contention on this subject. It seems to be the general rule that where authority is given to three or more persons to perform a public duty the majority may decide. This was the rule at common law and has been generally followed in this country. *Rogan v. Walker*, 1 Wis. 527; Mechem, Pub. Off. § 572.

We have the following statute which has an important bearing on the subject:

"All words purporting to give a joint authority to three or more public officers or other persons shall be construed as giving such authority to a majority of such officers or other persons unless it shall be otherwise expressly declared

in the law giving the authority." Sub. (3), sec. 4971, Stats.

Sec. 20.74 does not in terms declare that a joint authority is given to the three officers named, but in view of the nature of their duties that would seem to be its effect. It is apparent that the duties imposed by the act might become very important. Those duties were of such a character as to require conference, deliberation, and consequent joint action.

The objects for which expenditures were asked in this case illustrate that differences of opinion might arise as to the approval of requests. Some items might be approved by a majority or all, and others might be disapproved. Occasions would arise for discussion and perhaps for concessions so that the general purpose of the statute should not be thwarted. The statute last quoted has several times been construed by this court as applicable in cases where joint authority was not expressly granted and where the persons empowered to act were not a board. *Darge v. Horicon Iron Mfg. Co.* 22 Wis. 691; *State ex rel. McCune v. Goodwin,* 24 Wis. 286; *Rogers v. Draves,* 154 Wis. 23, 142 N. W. 127.

The rule is too familiar to require any citation of authority that when a board is created by statute a majority may act. The three officers named in sec. 20.74 are not denominated as a board, but in various other statutes they have been described as the Emergency Board; their action is generally known as that of the Emergency Board, and most of their certificates have been signed "Emergency Board." We are convinced that the certification by the governor and state treasurer was a sufficient compliance with the statute.

In the very able brief of plaintiff's counsel many statutes have been referred to and discussed as having an important bearing on both the constitutionality and the interpretation of the main statute under consideration, and it is argued that in determining such questions much weight should be given to the practical construction which has been given to

statutes by the legislative and executive departments of government. In various parts of this opinion these statutes have been referred to.

We agree with defendant's counsel that such practical construction is not conclusive and under some circumstances it may have little weight. A statute clearly void cannot be validated by any number of former void statutes. Old age cannot give validity to such a statute, nor can the old age of similar statutes cure the fatal defect. Nevertheless, acquiescence in the validity of a statute for many years will have weight if there is room for doubt.

"While the courts are to determine for themselves all questions of constitutionality which come properly before them, yet it is proper and usual for them to show much respect to the decisions of the executive and legislative departments, made for their own guidance, upon the same questions, especially when such decisions have been acquiesced in and acted upon for a long period of time." Black, Const. Law (3d ed.) § 38, and cases cited.

"The principle of contemporaneous construction may be applied to the construction given by the legislature to the constitutional provisions dealing with legislative powers and procedure. Though not conclusive, such interpretation is generally conceded as being entitled to great weight, and should not be departed from unless manifestly erroneous. Any exercise of power by the legislature, which for a long time has passed unchallenged, must be deemed to have been approved by the people, unless forbidden by some subsequent constitutional provision." 6 Ruling Case Law, 63, 64, and cases cited.

Although the statute in question is of comparatively recent date, other statutes in principle the same were enacted soon after the adoption of the constitution, and we consider that the rules above stated are applicable. Perhaps for stronger reason practical construction is often useful in determining the interpretation of statutes of doubtful meaning.

It is the final objection to the granting of the writ that the secretary of state exercised his discretion and should not

be compelled to audit the voucher. It is a familiar rule that where the performance of an official duty involves the exercise of discretion the officer cannot be compelled by *mandamus* to take particular action. He can be directed to act, leaving it to his discretion as to what particular action he will take. But it is equally well settled that "where a disbursing officer refuses to pay a claim presented to him, which has been ascertained in amount and which it is his duty to discharge, *mandamus* is generally recognized as the appropriate remedy to compel its payment. . . ." 18 Ruling Case Law, 221, and cases cited. See cases cited in 98 Am. St. Rep. 880.

By the certification by a majority of the designated officers the amount of the sums needed was determined. There was also thus determined the existence of the other facts prescribed by the statute. The sums to be paid have thus become definitely fixed and the duty in respect to its payment was ministerial, not discretionary.

Counsel for defendant cite numerous cases in which the rule is declared that the discretion of an officer as to his mode of action will not be controlled by *mandamus*. But most of the cases are not inconsistent with the rule that, where a disbursing officer refuses to pay a claim which has been definitely fixed in amount and which it is his duty to discharge, *mandamus* will lie. They are cases for the most part in which it plainly appeared that it was attempted to control the discretion of the officer.

The case which seems to be most relied on is *State ex rel. Martin v. Doyle,* 38 Wis. 92. In that case a statute had provided for submitting to certain commissioners a claim of the relator against the state and that upon the filing of their report with the secretary of state, "on his approval thereof," he should draw his warrant for the amount. The secretary of state approved part of the claim and disapproved the balance. It was held that, since the statute expressly made the claim payable only on the approval of the

secretary, there was vested in him a discretion which the court would not undertake to control.

In the present case the facts are to all intents and purposes undisputed. The defendant stands on certain propositions of law with which, as already appears, we do not agree. We think it logically follows that *mandamus* is a proper remedy.

*By the Court.*—The demurrer to 'the return to the alternative writ is sustained, and it is adjudged that the peremptory writ of *mandamus* issue as prayed in the complaint. No costs are awarded.

Eschweiler, J. (*dissenting*). It is by the majority opinion now held that an appropriation of public funds of 1924 to be applied under the certification of two state officers was a completed appropriation when the bill embodied in ch. 609, of which sec. 20.74 was a part, became a law in 1915. In other words, that the legislature of 1915, with the approval of the then governor, *then* appropriated from the state treasury of 1924 sums of money which the legislature of 1923 expressly refused to appropriate.

I assume that it is not necessary to cite authorities to the effect that it has been in this state and elsewhere firmly established:

(1) That the legislature in one session cannot, as to matters such as are here concerned, tie the hands, control, or limit the power of a subsequent legislature except in the one particular found in sec. 6, art. VIII, Const., which absolutely prohibits the repeal of any appropriation or levy of taxes until principal and interest of any debt to which such shall have been applied shall have been wholly paid; (2) that a legislature cannot delegate its legislative function; and (3) that the raising of public funds and the appropriation thereof when raised is a purely legislative function.

Art. VIII, Const., is devoted to the subject of state finances. In sec. 2 thereof it is provided: "No moneys shall

be paid out of the treasury except in pursuance of an appro-
priation by law." (This was the original section, the addi-
tional sentence now found there having been added by
amendment in 1877.) Sec. 5 makes it the duty of the legis-
lature to provide an annual tax sufficient to defray the esti-
mated expenses of the state for each year; and whenever the
expenses of any year shall exceed the income the legislature
shall provide for levying a tax to help meet the deficiency.
This provision should be construed in connection with the
fact that, until amended in November, 1881, sec. 11, art. IV,
provided for *yearly* sessions of the legislature. The intent
and purpose of this sec. 5 would appear to be that the
makers of the constitution intended that the lawmakers of
the future should adjust and balance the levy of taxes and
the appropriations of public funds for limited and definite
periods, measured evidently by the respective sessions of
the legislature, rather than in the method now upheld,
whereby an appropriation of 1915, unlimited in amount at
least until the general fund is entirely exhausted, is per-
mitted in 1924.

Sec. 8 of art. VIII further shows the importance the
makers of the constitution attached to its dominant purpose
of firmly intrenching safeguards over legislative methods to
be used when dealing with the collection or disbursement
of public funds. Such section reads, so far as seems ma-
terial here, that on the passage in either house of any law
which imposes, continues, or renews a tax, or creates a debt
or charge, or *makes, continues,* or *renews* an appropriation
of public or trust money, the question thereon shall be taken
by yeas and nays, duly entered on the journal, and three
fifths of the members elected to each house shall be required
to constitute a quorum.

The necessity for a legislative appropriation pursuant to
art. VIII, sec. 2, *supra,* in order to authorize the expendi-
ture now being upheld in 1924, is frankly conceded and
such necessary legislative appropriation is now squarely
placed on the act of the legislature of 1915.

If, the appropriation of large sums now to be taken from the general fund pursuant to the majority decision is to be upheld, then it seems to me there is an utter disregard of sec. 5, *supra*.   On the other hand, if what is now being upheld as a proper withdrawal of such public funds is being done by virtue of the present action of two state officers, then such present action either *continues* or *renews* the appropriation of public moneys in 1915 and is then violative of sec. 8, *supra*.   Still further, it should be noted that if the legislature of 1923 did desire to follow either or both of said sections of the constitution, then, as is in effect stated in the majority opinion and as appears from the facts in the record, they declared their express unwillingness, in the usual and customary manner, by refusing to make specific appropriations for the identical expenditures now being allowed.

I can see no valid reason for entirely discarding sec. 8, art. VIII, *supra*.   If the legislature of 1915 can lawfully make an appropriation for the year 1924 and out of public funds not coming into the state treasury until long after, then there seems to be no need of what is so carefully and expressly provided for in said section that the yeas and nays on a legislative vote shall be taken and entered on the journal as to any legislative act which *continues* or *renews* an appropriation of public or trust money.

If such safeguards were necessary when the legislature met annually, they can certainly be no less wise or necessary precautions when the intervals are longer.   At any rate these provisions were not changed in 1881, when biennial sessions were provided for, nor have they been since.   All these safeguards seem now to be set aside and two state officers are permitted to do that which the legislature might have done in the ordinary and orderly way by specific appropriations and which the legislature expressly refused to do.   This seems like giving these officers legislative power, and with a vengeance.

It should not be overlooked that ample provision is made by the constitution for the doing of that which the legis-

lature has not done or had no opportunity to do in its regular session, by the provision that matters may be presented to them and acted upon by them in special session, convened by the governor.   Sec. 11, art. IV; sec. 4, art. V.

For instance, in the special session of 1920, by ch. 1, substantial appropriations were made for the state university. By ch. 2 that which in sub. (2) (a), sec. 20.38, Stats. 1919, had been an appropriation on July 1, 1920, of $50,000 for operation of the normal schools, was amended to read $236,000.  By ch. 4 the law relating to taxation and tax levies for school purposes was amended.  Chs. 3, 5, 6, 7, 11, 12, 13, 14, 19, 22, and 29 related to schools or kindred subjects.  Ch. 30 provided for a new section to be added to the statutes establishing a state hospital in connection with the medical school of the University of Wisconsin and providing for very large funds for buildings.

Many other special sessions have been convened, legislation enacted, and appropriations made, so such a method of the legislature exercising its unquestioned legislative functions is neither unconstitutional nor unprecedented.   I am therefore convinced that there is no constitutional warrant for the disbursements approved of in the majority opinion.

But even though sec. 20.74 were a constitutional enactment, as it is now held to be, still I think that by its language an emergency appropriation requires the certification by each of the three state officers and not by a mere majority.   Each is a constitutional officer and clothed by that instrument with certain powers, functions, and duties which the legislature cannot lessen or destroy and which remain with each while acting under this law.

The governor is vested with the executive power of the state (sec. 1, art. V), and as such he has the power to approve or veto "every bill which shall have passed the legislature."   Sec. 10, art. V.

The treasurer and secretary of state are declared to be administrative officers. Sec. 1, art. VI.

The secretary of state becomes governor when the governor and lieutenant-governor cannot serve (sec. 8; art. V), and shall be *"ex officio* auditor" (sec. 2, art. V). That the power to audit is one of substance and the duty mandatory on officers of a municipality as a safeguard on its funds was very recently held by this court. *White C. Co. v. Beloit,* 178 Wis. 335, 337, 190 N. W. 195. No less importance should be given to such safeguards as to state funds.

The treasurer, as the name implies and statute provides. (sec. 14.42), has the custody of the state's funds.

It is to these three designated constitutional officers that power is given by sec. 20.74. The power is not given to them jointly or as a board or to a majority of them. The power thereby given concerns and involves the identical powers and duties expressly conferred on the governor and secretary of state by the constitution, and impliedly by that instrument and by statutes under it on the treasurer. A situation slightly changed from that represented and we might have the treasurer and secretary of state agreeing on such an uplifting of the lid of the treasury and the governor opposing; then the latter's veto power, not to be taken from him if an appropriation were made in the regular manner by the legislature, would, by the ruling now made, be held for naught, and two state officers, with this decision to back them, permitted to override the executive disapproval, which, in the case of direct legislative appropriation, would require a two-thirds vote of the members present in each house (sec. 10, art. V, *supra*) to accomplish.

Today these extra-legislative appropriations are with, tomorrow they may be without, the executive approval. The ruling now declared would of course then have to be the same.

Lastly, sec. 20.74 annually makes, according to its own terms, "an emergency appropriation." It is in effect now held that that which would be, as a legislative appropriation, an ordinary and usual one to meet the ordinary operating ex-

penses, is, solely because the legislature expressly refused to make it, now declared to be an emergency appropriation; that is, the ordinary is now the catastrophe, or else the word "emergency" is relegated beyond the vanishing point of statutory perspective.

That the word "emergency," when used in our statutes, means an unusual, rather than the ordinary, course of events, was declared with reference to the powers given the railroad commission by sec. 1797*m*—99, Stats., providing for temporary alteration of public utility rates, as disclosed in the thoughtful and fully considered opinion by the late Mr. Chief Justice Siebecker in *La Crosse v. Railroad Comm.* 172 Wis. 233, 236, 178 N. W. 867. The same substantial distinction was recognized both by Congress and the United States supreme court as to the interstate commerce commission, which had no emergency powers until given such by express amendments in 1917 and 1920. See *Peoria & P. U. R. Co. v. U. S.* 44 Sup. Ct. 194 (decided January 7, 1924), and *Burr v. San Francisco,* 186 Cal. 508, 199 Pac. 1034, 17 A. L. R. 581, and note on p. 586.

I think, therefore, the demurrer to the return should be overruled.